**WEST 14TH STREET COMMERCIAL CORP., West 14th Street Garage Corp., and West 14th Street Laundry Corp., Plaintiffs-Appellees,**

v.

**5 WEST 14TH OWNERS CORP., Defendant-Appellant.**

No. 27, Docket 86–7210.

United States Court of Appeals, Second Circuit.

Argued Aug. 25, 1986.

Decided March 18, 1987.

Alan Warshauer, New York City (Galef & Jacobs, Daniel A. Nadborny, New York City, of counsel), for defendant-appellant.

Robert J. Zastrow, New York City (Stroock & Stroock & Lavan, Joseph L. Forstadt, Andrew R. Kaplan, New York City, of counsel), for plaintiffs-appellees.

Joseph Gaier, New York City (Joseph Gaier, P.C., Steven A. Gold, Mark L. Koren, New York City, of counsel), filed a brief amicus curiae.

Marc L. Luxemburg, New York City filed a brief for amicus curiae Council of New York Cooperatives.

Before FEINBERG, Chief Judge, CARDAMONE, Circuit Judge, and

KELLEHER, District Judge.*

CARDAMONE, Circuit Judge:

This appeal requires us to construe the Condominium and Cooperative Abuse Relief Act, 15 U.S.C. §§ 3601—16 (1982) (Act), enacted to protect the rights of tenants whose residential apartment buildings are converted to cooperatives or condominiums. Realizing that many tenants are too unsophisticated on account of age or infirmity to evaluate properly the complex choices offered them upon conversion, Congress sought to alleviate developer abuses during the conversion process. At the same time Congress recognized that developers deserve a fair return on their investment. Yet when a developer's profit is unconscionable, it comes at the tenants' expense. Thus, the scope of the Act must be determined in light of these concerns.

## BACKGROUND

In 1982 Parker 14th Associates (Parker or the developer) sought to convert its apartment building located at 5–19 West 14th Street in New York City to a cooperative form of ownership. Believing the offering plan to be unfair, the tenants banded together and signed a no-buy pledge agreement. Later, they negotiated with the developer for a year over the details of the conversion, the plan became effective and title to the building was transferred to 5 W. 14th Owners Corp., the cooperative association owned by the tenant-shareholders. Owners Corp. now owns the building and is the defendant-appellant in this action.

As part of the negotiated conversion plan, Owners Corp.—while still managed by directors appointed by the developer—signed three long-term contracts that assigned profitable rights to the plaintiffs-appellees, three developer-affiliated corporations, West 14th Street Commercial Corp., West 14th Street Garage Corp. and West 14th Street Laundry Corp. The instant suit was precipitated when a tenant-controlled board took over Owners Corp. and, under the authority of the Act, purported to terminate the three contracts negotiated by the tenants' organization.

### A. *The Conversion*

After Parker—the owner of the subject high-rise multiple residence building at Fifth Avenue and 14th Street in Union Square—decided to convert the building to a cooperative, it filed an Offering Plan in 1982 that included the three contracts in question. In response the tenants organized the P.G. Tenant's Unity Group (Unity Group) and collected no-buy pledges from over 65% of the tenants. These actions deprived the developer of the number of inside buyers it needed to evict non-buying tenants under New York's Martin Act, N.Y.Gen.Bus.Law § 352–eeee (McKinney 1984), amended by 1982 N.Y. Laws c. 555 § 2. Parker then proposed a non-eviction plan which, to become effective under the Martin Act, required that 15% of the insiders purchase their apartments. *Id.* Obtaining subscriptions from only 4% of the tenants, the developer was forced into negotiations with Unity Group.

Although they now dispute the nature and extent of these negotiations, the two sides met several times during the year, filed amendments to the Offering Plan, and made material changes in all three contracts. The developer stated in the record that it "remained completely adamant" that the laundry, garage and commercial space be leased back to it as part of the conversion plan. It negotiated only as to the rent it would pay. There is evidence that the Unity Group and Parker reached at least a tentative agreement on these leases, which was communicated to the tenants in a newsletter and at a meeting. By January 6, 1984 when the Plan was declared effective, 36% of the units had committed to purchase and by the end of January 85% of the tenants had purchased. On August 28, 1984, a week before the closing, the three contracts were sent to Unity Group's attor-

* Honorable Robert J. Kelleher, Senior United States District Judge for the Central District of California, sitting by designation.

ney for comments. On September 6, 1984, with Unity Group representatives present, the closing was held at which all three of the contracts in question were signed. At that time defendant Owners Corp. was still under the legal control of directors appointed by the developer, and the closing documents were signed for all parties by persons associated with the developer.

## B. *The Contracts*

The three contracts at issue are the Master Commercial Lease, the Parking Garage Lease, and the Laundry Concession.

### 1. *The Master Commercial Lease*

Owners Corp., after replacing the developer as landlord, leased space to plaintiff 14 West Commercial Corp. in the building for four commercial retail stores. The lease ran for a period of 20 years, with a 20–year option to renew. The rent was admittedly well below market, providing plaintiff Commercial Corp. with an opportunity to sub-let the property at a substantial profit. This additional profit potential was acknowledged in the "Special Risks" point of the Offering Plan. Owners Corp. remained responsible for providing water, utilities and insurance over the lease term and was obliged to absorb any increase in these expenses. The retail stores were to be open to the general public.

### 2. *The Parking Garage Lease*

Plaintiff 14 West Garage Corp. leased the parking garage space in the building's basement and cellar from Owners Corp. This lease also ran for 20 years at admittedly below market rent with a similar renewal option. Although the parking garage was open to the general public, unit holders leased about one-third of the spaces and the Garage Corp. had an obligation—stated in the Offering Plan—to give building residents first preference when spaces became vacant. The garage lease included a covenant that the space be used only as a parking garage, and set forth the understanding of the parties that the service of a parking garage was an "integral part of

the operation of a high-class multiple dwelling."

### 3. *The Laundry Concession*

Owners Corp. also entered into an agreement with 14 West Laundry Corp. for the latter to provide coin-operated washing machines and dryers in the building's laundry room and receive the income from those machines for the next 20 years in return for paying the cooperative $1,500 per month. The laundry room serves the building's residents and is not open to the general public.

### C. *The Termination and Proceedings Below*

On October 10, 1984 a meeting of the shareholders of Owners Corp. was held at which officers and directors independent of the sponsor were elected. The outgoing Board requested, but was denied, a ratification of all prior corporate acts. On June 12, 1985, in accordance with § 3607 of the Act, a meeting of the shareholders was held at which a resolution was passed—by more than the statutorily required ⅔ majority—to terminate the three described contracts. On July 3, 1985 Owners Corp. served upon plaintiffs the statutorily required 90 day notice of termination. Plaintiffs immediately filed this declaratory judgment action and sought injunctive relief in the United States District Court for the Southern District of New York (Knapp, J.). The district court declared Owners Corp.'s termination of the contracts void and granted plaintiffs' motion for summary judgment holding that the challenged contracts fell outside the scope of the Act. It also denied defendant's motions for summary judgment or dismissal of plaintiffs' complaints. From the district court's opinion and judgment, 625 F.Supp. 934 (S.D.N.Y.1986), Owners Corp. appeals.

## DISCUSSION

### I FEDERAL QUESTION JURISDICTION

Owners Corp. argues for the first time on appeal that the district court lacked

subject matter jurisdiction. Because all the parties are New York corporations, if jurisdiction is to be found it must rest upon 28 U.S.C. § 1331 (1982) which grants jurisdiction to federal district courts for civil actions "arising under" federal law.

To define what constitutes federal question jurisdiction, it is helpful to analyze the subject in historical perspective. Under the Constitution federal question jurisdiction was originally very broad. Chief Justice Marshall, commenting on the constitutional provisions of Art. III § 2[1] in *Osborn v. Bank of United States*, 9 Wheat. 738, 22 U.S. 326, 6 L.Ed. 204 (1824), stated that "[w]hen a question to which the judicial power ... extend[s] ... forms an ingredient of the original cause, it is in the power of congress to give the circuit courts jurisdiction of that cause, although other questions of fact or of law may be involved in it." 9 Wheat. at 823, 22 U.S. at 362. Later, as a result of a statutory enactment, access to a federal forum was restricted. Judiciary Act of 1875, Act of March 3, 1875, ch. 137, § 1 et seq., 18 Stat. 470. Section 5 of that Act directed a federal court to dismiss or remand a suit if it appeared at any time "that such suit does not really and substantially involve a dispute or controversy properly within [its] jurisdiction." There is wide agreement that the statute narrowed the path, *see, e.g., Romero v. International Terminal Operating Co.*, 358 U.S. 354, 379, 79 S.Ct. 468, 483, 3 L.Ed.2d 368 (1959), but defining that path's precise boundaries has often proved to be a Sisiphyean task.

■ There are two tests under which an action may present a federal question. The first asks whether federal law creates the cause of action. If so, federal question jurisdiction exists. In *American Well Works Co. v. Layne & Bowler Co.*, 241 U.S. 257, 36 S.Ct. 585, 60 L.Ed. 987 (1916), Justice Holmes devised this still relied upon rule writing that "[a] suit arises under the law that creates the cause of action." *Id.* at 260, 36 S.Ct. at 586; *see also The Fair v. Kohler Dye & Specialty Co.*, 228 U.S. 22, 25, 33 S.Ct. 410, 411, 57 L.Ed. 716 (1913).

■ If state law creates the cause of action, the second test asks whether that cause of action poses a substantial federal question. The lineage of this second test of "arising under" jurisdiction reaches back 65 years to *Smith v. Kansas City Title & Trust Co.*, 255 U.S. 180, 201, 41 S.Ct. 243, 245, 65 L.Ed. 577 (1921). In that case, plaintiff sought to enjoin defendant corporate officers from investing corporate funds in farm loan bonds issued by federal land banks because the act authorizing their issue was unconsitutional—and hence constituted an investment in an unlawful security under Missouri law. The Supreme Court found federal jurisdiction present because of the necessity to decide the constitutional issue as an element of the state law claim.

■ In determining whether the complaint presents a federal question, the court must examine it in accordance with the well-pleaded complaint rule. Posited 13 years after the 1875 Act in *Metcalf v. Watertown*, 128 U.S. 586, 95 S.Ct. 173, 32 L.Ed. 543 (1888), this rule states that federal jurisdiction must be found from "what necessarily appears in the plaintiff's statement of his own claim ..., unaided by anything alleged in anticipation of avoidance of defenses which it is thought the defendant may interpose." *Taylor v. Anderson*, 234 U.S. 74, 75–76, 34 S.Ct. 724, 724, 58 L.Ed. 1218 (1914); *see also Louisville & Nashville Ry. v. Mottley*, 211 U.S. 149, 29 S.Ct. 42, 53 L.Ed. 126 (1908). This "powerful doctrine", *Franchise Tax Board v. Construction Laborers Vacation Trust*, 463 U.S. 1, 9, 103 S.Ct. 2841, 2846, 77 L.Ed.2d 420 (1983), remains the initial reference by which a federal court must determine whether there is "arising under" jurisdiction. *See Merrell Dow Pharmaceuticals, Inc. v. Thompson*, —— U.S. ——, 106 S.Ct. 3229, 3232, 92 L.Ed.2d 650 (1986). Examining only those allegations which are properly raised in a well-pleaded complaint, the court must then determine whether the substance of those allegations raises a federal question.

Recently, the Supreme Court reaffirmed its adherence to the "well-pleaded com-

plaint" rule and to the two tests for "arising under" jurisdiction just described. Emphasizing that any federal issue raised in a non-federal cause of action must be really substantial, the Court warned, "the mere presence of a federal issue in a state cause of action does not automatically confer federal question jurisdiction." *Merrell Dow*, 106 S.Ct. at 3235 (footnote omitted); *see also Gully v. First National Bank*, 299 U.S. 109, 116, 57 S.Ct. 96, 81 L.Ed. 70 (1936) (where in a state cause of action " 'the federal nature of the right to be established is decisive' " there is a substantial federal question) (quoting *Puerto Rico v. Russell & Co.*, 288 U.S. 476, 483, 53 S.Ct. 447, 450, 77 L.Ed. 903 (1933)). To determine when the federal element is deemed sufficiently substantial we must look to the nature of the federal interest at stake. *Merrell Dow*, 106 S.Ct. at 3236 n. 12. *Merrell Dow* held that when Congress has provided no private right of action under a federal statute, the borrowing of that federal law as a standard of conduct in a state created action is not sufficiently substantial to confer federal question jurisdiction.

■ In short, not every case or cause of action that knocks on the federal courthouse door gains entrance. To determine whether the court has federal question jurisdiction to decide the case, the complaint must contain either a federal cause of action or a state cause of action embodying a substantial federal question. With this formula in mind, we turn to the jurisdictional question.

## II APPLICATION TO INSTANT CASE

Applying the above rules to the facts of the present case, we conclude that because one section of the Act, 15 U.S.C. § 3611, expressly grants plaintiffs the right to bring an action in federal court under § 3607, the provision of the Act that authorizes termination of self-dealing contracts, plaintiffs' well-pleaded complaint presents a federally-created cause of action. Alternatively, we hold that even if plaintiffs have no statutorily created federal action under § 3607, their state claims encompass a substantial federal question under the Condominium and Cooperative Abuse Relief Act. We further conclude that either finding is sufficient to establish "arising under" jurisdiction.

### A. *Federal Cause of Action*

[5] 15 U.S.C. § 3611 provides in relevant part:

#### Suits at law or equity

(a) Unless otherwise limited as in section 3607 or 3608 of this title, any person aggrieved by a violation of this chapter may sue at law or in equity.

#### Recovery of actual damages

(b) In any action authorized by this section for a violation of section 3607 or 3609 of this title where actual damages have been suffered, such damages may be awarded or such other relief granted as deemed fair, just, and equitable.

Based on this provision, plaintiffs' three developer-affiliated corporations seek a declaration that defendant's termination of the three contracts was not authorized by § 3607 and was, therefore, void. The complaint asserts subject matter jurisdiction in federal court under both 28 U.S.C. § 1331 and 15 U.S.C. § 3612. The latter gives the federal courts jurisdiction to hear "actions at law or in equity brought under [The Condominium and Cooperative Abuse Relief Act of 1980] without regard to the amount in controversy." Thus, the allegations of the complaint alone—under the well-pleaded complaint rule—reveals that plaintiffs' cause of action is a direct product of §§ 3607, 3611, and 3612.

Defendant Owners Corp. argues that neither party has an "action at law or equity" under § 3607 because the statute was intended to furnish a "non-judicial" remedy. *See* S.Rep. No. 736 96th Cong., 2d Sess. 51, *reprinted in* 1980 U.S. Code Cong. & Ad. News 3506, 3558. But § 3611(b) refers to "any action authorized by this section for a violation of section 3607." Hence, even a cursory reading of the statute demonstrates that defendant's contention is without merit. Further § 3611(a) grants a private right of action to "any person aggriev-

ed by a violation of this chapter." We conclude that plaintiffs were so aggrieved. In essence, plaintiffs claim that Owners Corp. wrongfully terminated their contracts under the auspices of § 3607. If Owners Corp.'s termination under § 3607 was not lawful, plaintiffs have been aggrieved by Owners Corp.'s misapplication of the statute.

Legislative history supports this conclusion. The Senate version of § 3611 had originally provided for a civil remedy only by "one or more purchasers, or by a tenants' organization or an owners' association" against "[a] developer or his successor or agent" S.Rep. No. 736 at 78, *reprinted in* 1980 U.S. Code Cong. & Ad. News at 3385. The Conference version amended this provision to give a remedy to "any person aggrieved by a violation of this chapter." The amendment plainly indicates that Congress did not limit the right to sue under this statute merely to aggrieved tenants. Moreover, the general purpose of the Act to provide federal relief in an area traditionally reserved to the states coupled with an explicit grant of federal jurisdiction strongly suggests a Congressional purpose to resolve all § 3607 disputes under federal law. It would make little sense to relegate developers to a state law remedy when the actions complained of are taken under the authority of a federal statute. Consequently, plaintiffs, as aggrieved persons, have a right of action expressly provided in § 3611 that supports the exercise of federal subject matter jurisdiction. *See Merrell Dow,* 106 S.Ct. at 3232–33.

### B. *State Created Cause of Action Presenting a Substantive Federal Question*

■ Even if plaintiffs had no express right of action under the statute, their complaint would still present a federal question sufficient to confer jurisdiction under 28 U.S.C. § 1331. That complaint seeks a declaration "that the termination of the leases by Owners Corp. is of no force and effect" because the statutory authorization under § 3607 does not encompass the three contracts at issue or, in the alternative, if the

statute applies, that it is unconstitutional. Plaintiffs also sought an injunction against future terminations by Owners Corp. and damages.

■ Defendant urges that the complaint simply sets forth a state-law claim for breach of contract, with the federally authorized termination asserted only as an anticipated defense. Plaintiffs respond that its declaratory judgment complaint raises a federal question. We note at the outset that federal jurisdiction cannot be based on the fact that a declaratory judgment is sought because the declaratory judgment statute does not expand the jurisdiction of the federal courts. *Skelly Oil Co. v. Phillips Petroleum Co.,* 339 U.S. 667, 671, 70 S.Ct. 876, 878, 94 L.Ed. 1194 (1950). Instead, a court must look beyond the declaratory judgment allegations and determine whether a substantial federal question arises either from the defendant's threatened action, *Franchise Tax Board,* 463 U.S. at 16 & n. 14, 103 S.Ct. at 2849 & n. 14; *Public Service Commission v. Wycoff Co.,* 344 U.S. 237, 73 S.Ct. 236, 97 L.Ed. 291 (1952), or from the complaint when viewed as a request for coercive relief apart from the defendant's anticipated suit. *Stone & Webster Engineering Corp. v. Ilsley,* 690 F.2d 323, 327–28 (2d Cir.1982), *aff'd.,* 463 U.S. 1220, 103 S.Ct. 3564, 77 L.Ed.2d 1405 (1983). Under either approach plaintiffs have a cause of action that arises under federal law.

### 1. *Defendant's Threatened Action*

The first approach analyzes an action that would have been brought by the declaratory judgment defendant. In *Franchise Tax Board* the Supreme Court stated that

> Federal courts have regularly taken original jurisdiction over declaratory judgment suits in which, if the declaratory judgment defendant brought a coercive action to enforce its rights, that suit would necessarily present a federal question.

463 U.S. at 19, 103 S.Ct. at 2851. The developer-affiliated plaintiff corporations

argue that the declaratory judgment defendant, Owners Corp., was threatening to and could have brought a federal action under § 3607. Because plaintiffs were anticipating a federal suit, they claim that their declaratory judgment action presents a federal question. Owners Corp. responds that it need not have brought a federal suit, but could have sued in state court in trespass, ejectment, or contract.

Although there is no meritorious contract action available to Owners Corp., it is true that it could have brought a state action in trespass or ejectment. But, a well-pleaded complaint under either of these theories would have to set forth Owners Corp.'s current right to possession. *Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 666, 94 S.Ct. 772, 776, 39 L.Ed.2d 73 (1974) (ejectment); *New York v. White*, 528 F.2d 336 (2d Cir.1975) (same); *Donohue v. Whitney*, 133 N.Y. 178, 30 N.E. 848 (1892) (trespass); *Firment v. Bryden*, 54 A.D.2d 796, 387 N.Y.S.2d 737 (3d Dep't 1976) (same). And, because Owners Corp.'s "current right to possession [is allegedly] conferred by federal law" under the authority of § 3607, a well-pleaded complaint alleging these state law possessory actions would necessarily raise a federal question. *Oneida Indian Nation*, 414 U.S. at 666, 94 S.Ct. at 776.

Owners Corp. further contends that it need not have sued under § 3607 but could have locked-out plaintiffs and their sub-tenants forcing them to initiate coercive legal action. Yet, under *Franchise Tax Board* the question is not whether the declaratory judgment defendant would necessarily bring a federal action, but rather *if it brought an action* would such action necessarily have raised a federal question. Although defendant might have regained possession of the property through self-help remedies, it could not have disposed of the legal dispute without judicial resolution of the propriety of its actions under § 3607; hence in bringing suit it would have created federal question jurisdiction for the issues in dispute.

### 2. The Complaint As Coercive Relief

The second approach leads to the same conclusion. In addition to examining defendant's "threatened" action, we examine plaintiffs' complaint to see if it raises a federal question when viewed as a coercive action apart from defendant's anticipated suit. *Stone & Webster*, 690 F.2d at 327–28. To do this, it is necessary to identify the substantive theory upon which plaintiffs could have brought their cause of action to determine whether the federal issue would arise under a "well-pleaded" complaint.

Although there is some discretion when construing plaintiffs' complaint, *New York State Waterways Assoc. v. Diamond*, 469 F.2d 419, 421 (2d Cir.1972), federal jurisdiction may not rest on an equitable claim when an adequate remedy at law that would not confer such jurisdiction is available. *White*, 528 F.2d at 338. No legal remedies adequately fit plaintiffs' complaint. There is no action for trespass or ejectment because plaintiffs are in possession or constructive possession (through sub-tenants) of the real property, *see White*, 528 F.2d at 338–39. Nor would a contract action be appropriate because plaintiffs seeks to retain possession of the property under the leases rather than merely obtain damages. Thus, we assume that whatever state claim plaintiffs have is equitable in nature.

Viewing the complaint as an equitable action seeking coercive relief, it may properly be considered as a common law or statutory action to remove a cloud on title. Under *Hopkins v. Walker*, 244 U.S. 486, 37 S.Ct. 711, 61 L.Ed. 1270 (1917), "the existence and invalidity of the instrument or record sought to be eliminated as a cloud upon the title are essential parts of the plaintiff's cause of action." 244 U.S. at 490, 37 S.Ct. at 713. Consequently, since it is the provisions of § 3607 that give rise to the cloud, the statute must necessarily be pleaded in a well-pleaded action to remove that cloud. *Hopkins*, 244 U.S. at 491, 37 S.Ct. at 713; *White*, 528 F.2d at 339. Thus considered as a common law action, the complaint necessarily raises a substantial

federal question on the face of a well-pleaded complaint.

This conclusion is no different under a modern statutory action. New York has codified the common law action to quiet title and statutorily redefined the necessary elements for a well-pleaded remaining cloud on title complaint. Under Article 15 of the Real Property Actions and Proceeding Law, the plaintiff need only plead its claim to an estate or interest in land and defendant's adverse claim; plaintiff need not plead the "invalidity" of defendant's claim as required under the common law. N.Y. Real Prop. Acts Law § 1515.1 (McKinney 1979).[1] Plaintiffs' well-pleaded complaint under the quieting title statute would have to allege defendant's adverse claim under § 3607 and would therefore raise a federal question. Consequently, under either the common law or statutory formulation federal question jurisdiction would necessarily arise in a well-pleaded complaint.

### 3. *Substantial Federal Question*

*Merrell Dow* teaches that the above discussion—showing that a federal question appears on the face of a well-pleaded complaint—is not sufficient to demonstrate the existence of "arising under" jurisdiction. One final question remains: whether the federal issue arising in the state law cause of action is sufficiently "substantial" to confer federal-question jurisdiction. *Merrell Dow*, 106 S.Ct. at 3236. In this inquiry, "the nature of the federal issues at stake," *id.* at 3236 n. 12, with an eye to "practicality and necessity," *id.* at 3234, must be analyzed. In *Merrell Dow*, the Supreme Court looked at substantiality with narrowed eyes holding that where Congress has not provided plaintiff with a private right of action under a federal stat-

ute, it must be concluded "that the presence of a claimed violation of the statute as an element of a state cause of action is insufficiently 'substantial' to confer federal-question jurisdiction." *Id.* at 3236.

Nonetheless, assuming that plaintiffs have no private right of action under § 3607, we conclude that the federal element in plaintiffs' state cause of action would still be sufficiently substantial to confer arising under jurisdiction. In *Merrill Dow* the federal statute was merely incorporated by reference as a standard of conduct in a state negligence action. Here the situation is quite different. In construing the Condominium Relief Act in a state cause of action, the federal issue is decisive because upon that Act's construction the vindication of rights and definition of relationships *created by federal law* depends. *See Gully*, 299 U.S. at 116, 57 S.Ct. at 99. In light of this qualitative difference, the federal ingredient in plaintiffs' complaint in this case is sufficiently substantial to confer the arising under jurisdiction. Having found federal jurisdiction, we proceed to the merits.

### III REQUIREMENTS OF § 3607(a) MET

Plaintiffs argue that the three terminated contracts do not fall within the scope of § 3607(a). This section gives the cooperative association the right to terminate contracts which provide for (1) "the operation, maintenance, or management of a ... cooperative association ... or of property serving the ... cooperative unit owners," and are (2) between the unit owners and developer, (3) which were entered into while the cooperative association was controlled by the developer, (4) and are for a period of more than three years. 15 U.S.C. § 3607 (1982).[2]

---

1. Although § 1515.1 provides that "[t]he complaint must state that the action is brought pursuant to this article," N.Y. Real Prop. Acts. Law § 1515.1 (McKinney 1979), the New York Court of Appeals has held that the fact that the plaintiffs do "not refer to the article or use the language of the statute is not a fatal defect." *Howard v. Murray*, 38 N.Y.2d 695, 699–700, 382 N.Y.S.2d 470, 346 N.E.2d 238 (1976).

2. Section 3607 provides in pertinent part:
 Operation, maintenance, and management contracts; penalty
 (a) Any contract or portion thereof which is entered into after October 8, 1980, and which—
 (1) provides for operation, maintenance, or management of a condominium or cooperative association in a conversion project, or of

All four of these statutory elements must exist for a contract to fall within reach of the Act. The district court concluded that the contracts did not satisfy the elements of subdivisions (2) and (3) and therefore could not lawfully be terminated under § 3607. The district court reasoned that the negotiations between the parties rendered the remedial provisions of the Act unavailable to Owners Corp. Because it is conceded that all the contracts were for more than three years, subdivision (4) was not discussed.

On appeal, defendant asserts that the four subdivisions of § 3607 have been met. Although plaintiffs concede that the laundry room concession is subject to § 3607 of the Act, they argue that the garage and commercial leases—in addition to not meeting subdivisions (2) and (3), as the district court concluded—do not satisfy the elements of subdivision (1) either. Plaintiffs contend that these two leases do not involve "property serving" unit holders, and that the instruments in question are "leases" subject to § 3608 of the Act, not "contracts" within § 3607. In the discussion that follows, we take up all of these contentions.

—Subdivision (1) of § 3607(a)—

*Contracts Which Provide for Operation, Maintenance or Management*

██ In attempting to establish that the garage and commercial leases are not "contracts" for the purposes of § 3607, plaintiffs claim that the problem of unconscionable *leases* was addressed by § 3608.[3] Since § 3608 allows termination of leases only after the cooperative satisfies stringent limitations not present in § 3607, plaintiffs argue that an interpretation of § 3607 which includes leases would render these limitations ineffective. They also urge that a lease is a transfer of an estate in land, not a contract for operation maintenance or management and, therefore, beyond the scope of § 3607.

These arguments are flawed on a number of grounds. First, a "lease" as used in § 3608 is defined narrowly to include only property owned by the developer (or developer affiliated companies) leased *to* the cooperative project; not, as here, cooperative property leased *by* the cooperative to the developer. § 3603. Hence, the limitations of § 3608 are not undercut if § 3607 is construed to apply to leases where the cooperative association is the lessor.[4] Sec-

---

property serving the condominium or cooperative unit owners in such project;
(2) is between such unit owners or such association and the developer or an affiliate of the developer;
(3) was entered into while such association was controlled by the developer through special developer control or because the developer held a majority of the votes in such association; and
(4) is for a period of more than three years, including any automatic renewal provisions which are exercisable at the sole option of the developer or an affiliate of the developer, may be terminated without penalty by such unit owners or such association.
15 U.S.C. § 3607 (1982).

**3.** Section 3608 provides in pertinent part:
 Lease characteristics; authorization by unit owners; conditions precedent to action
 (a) Cooperative and condominium unit owners through the unit owners' association may bring an action seeking a judicial determination that a lease or leases, or portions thereof, were unconscionable at the time they were made. An action may be brought under this section if each such lease has all of the following characteristics:

(1) it was made in connection with a cooperative or condominium project;
(2) it was entered into while the cooperative or condominium owners' association was controlled by the developer either through special developer control or because the developer held a majority of the votes in the owners' association;
(3) it had to be accepted or ratified by purchasers or through the unit owners' association as a condition of purchase of a unit in the cooperative or condominium project;
(4) it is for a period of more than twenty-one years or is for a period of less than twenty-one years but contains automatic renewal provisions for a period of more than twenty-one years;
(5) it contains an automatic rent increase clause; and
(6) it was entered into prior to June 4, 1975.
15 U.S.C. § 3608 (1982)

**4.** We see nothing anomalous in interpreting § 3607 to apply to leases of cooperative owned property to a sponsor affiliated company but not to leases which run in the other direction. Where the sponsor leases developer-owned facil-

ond, legislative history reveals that leases as well as contracts are covered by § 3607. For example, Senator Williams, the bill sponsor, described § 3607 as a method for residents to void "a long-term self-dealing *leasing arrangement.*" 126 Cong.Rec. 28,-178 (1980) (emphasis added). The Senate Report also refers to "lease provisions" in discussing § 3607. S.Rep. No. 736, 96th Cong., 2d Sess. 95, *reprinted in* 1980 U.S. Code Cong. & Ad.News 3601 (Additional Views of Senators Garn, Lugar, Tower, and Armstrong). Third, a line drawn between leases and contracts would exalt form over substance. Leases, a species of contract, may contain covenants that require the lessee to perform certain contractual services for the landlord. For instance, both leases in this conversion contain affirmative covenants: the plaintiff garage tenant convenanted to "use and occupy the Demised Premises as a storage garage for ... automobiles" and to give first preference to the cooperative residents; the plaintiff commercial tenant convenanted to "use and occupy the demised premises for sale of retail goods to the public." Thus, a lease, in substance, may be nothing more than a contract of operation.

Finally, construing this statute so as to permit cooperatives to cancel only maintenance-type contracts, but not leases would, contrary to Congress' aim, serve as an incentive to developers to try and retain as much control over cooperative property as possible. For example, a *contract* for the operation of a laundry room, where the developer retained a fair percentage of the profits would be terminable, while a *lease* for the same laundry room space where the laundry room-tenant (developer) paid a below market fixed-rent would not be. Such an anomalous result would thwart Congress' plan.

### "Property Serving" the Unit-Owners

Plaintiffs also assert that the commercial and garage spaces are not "property serving the ... cooperative unit owners" for

the purpose of § 3607 because they do not *exclusively* serve the residents of the building. We cannot adopt such a narrow reading of this remedial law. The words "exclusive" or "exclusively" do not appear in the statute. Further, such an interpretation would enable developers in future conversion projects to sidestep the statute simply by eliminating the exclusive nature of any service. For instance, by opening a handful of spaces in a private parking lot to the public, or by giving the public access to a heretofore private laundry room, developers could remove their contracts from § 3607's reach.

Because no special meaning was attached to "property serving", we assume instead that Congress did not contemplate one. Consequently, the phrase should be accorded its plain, ordinary meaning of providing services. *Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979). In reaching this conclusion we rely on Congress' purpose. Legislative history reveals that the statute was designed to protect those services associated with recreational leases and management contracts, such as the provision for security, general maintenance and repair, elevator service, and the upkeep of communal areas. *See* 4B R. Powell & P. Rohan, *The Law of Real Property* ¶ 633.-35[3], 633.36 (1986) (describing the various services); Krebs, *Legislative Response to "Sweetheart" Management Contracts: Protecting the Condominium Purchaser,* 55 Chi-Kent L.Rev. 319 (1979); Annot., 73 ALR 3d 613 (1976) (collecting and analyzing cases in which contracts challenged on claim of self-dealing); Note, Real Property-Condominiums-Developer Self-Dealing, 1975 B.Y.U.L.Rev. 295. From this history, it is plain that Congress aimed to protect property providing services primarily for the benefit of the unit-owners.

Applying this standard, an on-site parking garage is property providing a service primarily for the benefit of the cooperative. A parking garage, with or without tenant preferences, provides a service that

---

ities to the cooperative, it can hardly be said to be managing, maintaining, or operating that

property for the cooperative, absent an explicit reservation of those responsibilities.

tenants might reasonably expect as an essential adjunct of their apartment complex. In the instant case, a number of factors make it especially clear that the parking garage "serves" the unit-owners. The garage lease contained an affirmative covenant that the garage tenant would use the space to provide a specific service, *i.e.*, the operation of a parking garage. Further, although the garage was open to the public, both the Conversion Offering Plan and the building's certificate of occupancy contain provisions indicating that residents would have first preference for vacant spaces. Finally, the parties in this case set forth in the garage contract their understanding that "the services to be furnished by [the garage tenant] ... are an integral part of the operation of a high-class multiple dwelling...."

 Commercial stores, on the other hand, are primarily for the benefit of the *public.* Although the availability of commercial stores may be deemed to "relate directly to the ease, comfort and economy of the cooperative shareholders," *Phoenix Tenants Association v. The 6465 Realty Co.,* 119 A.D.2d 427, 435, 500 N.Y.S.2d 657 (1st Dep't 1986) (dissenting opinion), they do not serve as an integral benefit to the unit-holders in the same respect as on-site parking.

Concededly, it may be more convenient for unit-owners to have easily accessible banks, cleaners, drug and grocery stores, and the like. But these services are not the sort that a tenant should reasonably expect as an essential adjunct of an apartment complex. Again, the contracts bolster this conclusion. Clause 1 provides that the "tenant shall use and occupy de-

mised premises for sale of retail goods *to the public* and for no other purpose," and Clause 45A provides that the space "shall be used for retail space and services compatible with similarly situated cooperative apartment buildings *in the general area* of the Building." (emphasis added).

In sum, the garage leasing contract is a contract that provides for the operation, maintenance, or management of "property serving" the cooperative unit owners; but the commercial lease does not so qualify within the meaning of § 3607(a)(1).

—Subdivision (2) of § 3607(a)—
*Between the Unit Owners
and Developer*

 The contracts were signed by Parker, a "developer" as defined by § 3603(14)[5] and Owners Corp., a "cooperative association" as defined in § 3603(9).[6] Hence, it seems plain that the contracts were "between" the cooperative association and the developer. Nevertheless, the district court held that the contracts—while formally "between" the developer and Owners Corp.—were in reality "between" the developer and the tenants' Unity Group which negotiated the contracts. The district judge therefore held that the contracts could not be avoided by Owners Corp. Realizing that Unity Group could not legally bind Owners Corp., the trial court also concluded that the contracts were "ratified" when 80% of the tenants purchased shares in Owners Corp.

We reach the opposite conclusion. First, a contract is "between"—hence binding on—only those who are parties to it, as evidenced by their signatures. On this

---

5. This subsection provides that:

"developer" means (A) any person who offers to sell or sells his interest in a cooperative or condominium unit not previously conveyed, or (B) any successor of such person who offers to sell or sells his interests in units in a cooperative or condominium project and who has the authority to exercise special developer control in the project including the right to: add, convert, or withdraw real estate from the cooperative or condominium project, and maintain sales offices, management offices and rental units; exercise easements through common elements for the purpose of making improvements within the cooperative or condominium; or exercise control of the owners' association....

15 U.S.C. § 3603(14) (1982).

6. This subsection provides that a:

"cooperative association" means an organization that owns the record interest in the residential cooperative property; or a leasehold of the residential property of a cooperative project and that is responsible for the operation of the cooperative project.

15 U.S.C. § 3603(9) (1982).

ground, only Owners Corp. and the developer as signatories, and not Unity Group, are parties to the contracts. Logically, the contracts could not be "between" Unity Group and the developer because Unity Group is not a party to them. Although ratification could serve to bind Owners Corp. to the contracts, *see* 1A W. Fletcher, *Cyclopedia of the Law of Private Corporations*, § 210 (C.V. Swearingen rev. ed. 1983), no ratification took place. That event only occurs upon a vote of the board of directors to adopt the contracts, *id.;* it does not occur through the purchase of stock in the corporation. Thus, the purchase of shares in Owners Corp. by 80% of tenants is irrelevant. In short, because it was only the cooperative Owners Corp. itself that could ultimately bind the cooperative, the contracts must be "between" it and the developer.

—Subdivision (3) of § 3607(a)—
*Control by Developer*

■ Again, the contracts easily appear to satisfy the control by developer element of § 3607. Owners Corp. was under "special developer control" when it signed the contracts because it was directed by a board appointed by a developer-affiliate in accordance with the Offering Plan.[7] Although the district court recognized this, it still reasoned that because even an "independent" board would have signed the contracts, the undisputed evidence of developer control should be disregarded. The court believed an independent board would have been compelled to sign the contracts or risk losing the conversion plan.

This focus is misplaced. The crucial inquiry under § 3607 is whether the cooperative was free from developer control when it became obligated under the contracts, not whether an independent board would have signed them. As noted, the evidence that Owners Corp. was under developer control when it signed the contracts is undisputed.

### IV NEGOTIATIONS

■ Having found two of the three contracts to be within § 3607(a), we now address whether the negotiations between Unity Group and the developer render the Act inapplicable. As § 3607's title suggests, it was Congress' purpose to afford relief to unit-holders from the imposition of "self-dealing" or sweetheart developer contracts. The district court found that the contracts in this case were "in no sense 'self-dealing' " because of the negotiations between the parties. 625 F.Supp. at 942. This effort to read negotiations into the statute is misplaced.

In enacting § 3607 Congress provided tenants a non-judicial remedy. The Senate Report on § 3607—containing but a single sentence—makes the point: "Section [3607] provides a means by which unit owners ... may terminate a long-term, self-dealing contractual arrangement *without having to resort to judicial action."* S.Rep. No. 736 at 51, *reprinted in* 1980 U.S.Code Cong. & Ad.News at 3558 (emphasis added); *see also id.* at 95; 1980 U.S.Code Cong. & Ad.News 3600–01 (Additional Views of Senators Garn, Lugar, Tower, and Armstrong). The district court's construction of § 3607 that would allow developers to plead tenant negotiations as a defense to a § 3607 termination would force every termination into litigation. Courts would have to determine, for example, whether the specific contracts were the subject of negotiations and/or whether the parties were bargaining in good faith from roughly equal bargaining positions. Such a result would undermine the legislatively provided non-judicial remedy. Accordingly, we decline to read "a negotiation defense" into § 3607.

This conclusion is further supported by comparing § 3607 to its neighbor § 3608.[8] Unlike § 3607, § 3608(a) specifically provides for "a judicial determination" that a lease was unconscionable after considering several factors including "the commercial

---

**7.** "Special developer control" is defined as "any right arising under State law, cooperative or condominium instruments, the association's bylaws, charter or articles of association or incorporation, or power of attorney or similar agreement, through which the developer may control

or direct the unit owners' association or its executive board."
15 U.S.C. § 3603(22) (1982).

**8.** Section 3608(c) provides:

setting of the negotiations." § 3608(c)(1); *see also* 126 Cong.Rec. 28,179 (1980) ("[I]t is our intent that courts permit evidence on such matters as the relative bargaining position of the parties.") (statement of Sen. Williams). The absence of these factors in § 3607 persuasively indicates that Congress did not envision negotiations playing a role in the application of § 3607.

As a practical matter, a consideration of negotiations would deter future tenants from engaging in any discussions with developers for fear that they would be deemed to have waived their rights under the Act. Moreover, this view of § 3607 is consistent with Congress' desire to protect cooperative apartment owners in that it prevents the developers from offering the tenants a deceptively low purchase price financed by hidden costs spread over a number of years. Congress may have determined that even with effective representation in negotiations, tenants may still be unduly tempted by an artificially low insider purchase price into accepting hidden future costs. There may also have been concern that non-tenant buyers without representation by a tenant's organization might not be informed of concealed costs. Consequently, the existence of negotiations is not a relevant factor in determining whether a termination of a contract satisfies the requirements of § 3607.

## CONCLUSION

To summarize: the garage and laundry contracts satisfy all the elements of § 3607 and accordingly could properly be terminated by Owners Corp. At the same time, because the commercial lease is not a contract for the operation, maintenance, or management of property serving the cooperative unit owners, it was improperly ter-

minated by Owners Corp. Accordingly, the district court's grant of summary judgment in favor of plaintiffs insofar as it nullified the Owners Corp.'s termination of the laundry room concession and the parking garage lease is reversed. We remand that portion of the judgment to the district court with directions to enter judgment in favor of appellant Owners Corp. In all other respects, the judgment below is affirmed. All parties shall bear their own costs.

Affirmed in part, reversed in part and remanded.

---

Presentation of evidence after finding of unconscionability

(c) Whenever it is claimed, or appears to the court, that a lease or any portion thereof is, or may have been, unconscionable at the time it was made, the parties shall be afforded a reasonable opportunity to present evidence at least as to—

(1) the commercial setting of the negotiations;

(2) whether a party has knowingly taken advantage of the inability of the other party reasonably to protect his interests;

(3) the effect and purpose of the lease or portion thereof, including its relationship to other contracts between the association, the unit owners and the developer or an affiliate of the developer; and

(4) the disparity between the amount charged under the lease and the value of the real estate subject to the lease measured by the price at which similar real estate was readily obtainable in similar transactions.

15 U.S.C. § 3608(c) (1982)