The **BOARD OF MANAGERS OF The CHARLES HOUSE CONDOMINIUM,** Plaintiff–Appellant,

v.

**INFINITY CORPORATION and Schnurmacher Bros.,** Defendants–Appellees.

No. 787, Docket 93–7665.

United States Court of Appeals, Second Circuit.

Argued Dec. 16, 1993.

Decided April 7, 1994.

Norman Solovay, New York City (Jonathan Eiseman, John Wirenius, Solovay & Edlin, of counsel), for plaintiff-appellant.

Ira Levine, Garden City, NY (Samuel Kirschenbaum, Kirschenbaum & Kirschenbaum, of counsel), for defendants-appellees.

Before: MESKILL, WINTER, and PRATT, Circuit Judges.

GEORGE C. PRATT, Circuit Judge:

This case arises out of a prolonged dispute over the conversion of a building to condominium ownership. The primary issue before us is whether or not the condominium plan was invalid because the owner's interest in the building's garage was not conveyed to the residential apartment owners. The board of managers of the building ("the board"), brought a declaratory judgment action in the United States District Court for the Southern District of New York, Constance Baker Motley, *Judge,* against the sponsor of the condominium conversion and the original owner of the building. The district court granted summary judgment for the defendants, dismissed the complaint, and granted defendants' counterclaims. *See Board of Managers of the Charles House Condominium v. Infinity Corp.,* 825 F.Supp. 597 (S.D.N.Y.1993). The board now appeals.

## FACTS AND BACKGROUND

In 1955 defendant Schnurmacher Bros. ("Schnurmacher"), a New York partnership with extrinsic real estate holdings, purchased land and built a fifteen-story building located at 40 East 78th Street in Manhattan. Presently called "The Charles House Condominium", the building includes numerous residential apartments, stores, professional offices, and a parking garage. After one of the Schnurmacher partners passed away in 1981, the partnership began net-leasing buildings and selling purchase options on some of its real estate holdings as a means of raising funds for settling the obligations of the deceased partner's estate.

On April 5, 1984, Schnurmacher net-leased the Charles House building to 1001 Madison Corporation ("Madison"), a wholly owned subsidiary of Infinity Corporation ("Infinity"), a New York corporation. On the same day, Infinity entered into an option agreement with Schnurmacher under which it paid $6.6 million for the exclusive and irrevocable option to purchase the property. Under the terms of the agreement, Infinity could exercise its option either within ten years after the two surviving Schnurmacher partners, Adolph and Irwin Schnurmacher, passed away, or 47 years after the date of the agreement, whichever happened first. Both the lease and the option were subject to existing commercial and residential tenancies.

In July 1984 Infinity submitted to the New York State Attorney General a plan to convert the building to cooperative ownership, which prompted the building's tenants to form a tenants' committee. While Infinity and Schnurmacher ("defendants") contend that the tenants' committee was formed expressly to prevent the conversion of the building to cooperative ownership, the board maintains that the committee was formed simply to negotiate the terms of the plan with Infinity. At any rate, Infinity thought better of its plan and approached Schnurmacher about restructuring the transaction so as to convert the building to a condominium, rather than a cooperative.

Under the condominium plan, the building would be divided into several residential units and one commercial unit. Schnurmacher would sell the residential units, but retain ownership of the commercial unit. Furthermore, (1) Infinity would pay all of Schnurmacher's real estate taxes; (2) Infinity would pay all of Schnurmacher's other expenses

including fees for professional services and any real estate brokerage commissions; (3) Infinity would pay the state real property gains tax if the option to purchase the commercial unit was exercised at the purchase price of $26 million; (4) Infinity would pay an additional $2 million for the option on the commercial unit; and (5) the lease and option transactions between Schnurmacher and Infinity for two other buildings would be restructured as absolute sales.

After Schnurmacher agreed to restructure the transaction, Infinity withdrew its cooperative offering plan and submitted the condominium offering plan to the New York State Attorney General in July 1985. *See* N.Y.Gen.Bus.Law § 352. On December 18, 1985, the tenants' committee sent a letter to the Attorney General registering their objections to Infinity's condominium plan. The letter expressed the committee's belief that Schnurmacher and Infinity were alter egos and therefore the plan constituted illegal self-dealing. The Attorney General accepted the plan for filing on December 27, 1985.

On April 22, 1986, the Attorney General examined Adolph and Irwin Schnurmacher and their counsel under oath. After questioning them and reviewing several documents, he concluded that the transactions between Schnurmacher and Infinity were arm's length transactions and that the disclosures made in the conversion documents were adequate. A few days later, Schnurmacher modified its lease to Madison, making it subject to the condominium plan and changing it to a lease of the commercial unit.

The following month the tenants' committee and several other individuals initiated an Article 78 proceeding in the New York State Supreme Court, seeking to set aside and annul the determination of the Attorney General. On June 25, 1986, the Attorney General rescinded his acceptance of the condominium offering plan. Infinity then intervened in the Article 78 proceeding, seeking to compel the Attorney General to accept the offering plan for filing and to direct him to cancel and annul his June 25 letter of rescission.

On July 26, 1986, Schnurmacher executed a "Declaration Establishing a Plan for Condominium Ownership", *see* N.Y.Real Prop. Law art. 9–B, § 339–n, which was recorded in the Office of the City Register in New York City on September 4, 1986. The declaration established 102 residential units and 9 servant's room units, collectively the "residential units", as well as a "commercial unit" consisting of stores, offices, and the garage. In addition, it provided for sale of the residential units to Infinity and for a deed to the commercial unit to be issued to Schnurmacher.

On November 25, 1986, Schnurmacher conveyed title to the residential units to Infinity, which then offered them for sale to the public. On the same day, Schnurmacher and Infinity modified their option agreement to give Infinity an option to purchase Schnurmacher's interest in the commercial unit. By this time, Madison had merged into Infinity, which meant that Infinity succeeded to Madison's underlying tenancy under the lease. The modified lease and option agreements were recorded on December 16, 1986.

On February 11, 1987, New York Supreme Court Justice Robert E. White issued a decision in the Article 78 proceeding. He found that there had been no collusion or self-dealing between Schnurmacher and Infinity and no disclosure violations. He dismissed the petition of the tenants' committee and directed the Attorney General to accept the offering plan for filing. *In the Matter of the Application of the Tenants Comm. of 40 E. 78 St., et al. v. Abrams*, No. 99306/86 (N.Y.Sup.Ct. Feb. 11, 1987). Final judgment was entered on March 20, 1987. The petitioners filed a notice of appeal the following month.

The tenants' committee then entered into an agreement with Infinity that purported to resolve all outstanding issues. The tenants' committee agreed to withdraw its objection to the offering plan, to withdraw its appeal from the state-court Article 78 judgment, and to recommend to the residential unit owners not to commence any further litigation. This agreement was memorialized in an amendment to the offering plan, which was filed with the Attorney General on July 17, 1987.

Nearly five years later, on April 30, 1992, the board served a notice upon defendants

pursuant to the Condominium and Cooperative Abuse Relief Act, see 15 U.S.C. § 3601 et seq. ("Act"). By its terms, the notice terminated (1) the condominium offering plan; (2) the declaration; (3) the condominium by-laws; (4) the option agreement; (5) the lease between Schnurmacher and Madison; and (6) the deed to the commercial unit.

The board then filed the present action on behalf of the residential unit owners of the condominium. It sought a declaratory judgment that all right, title, and interest of the defendants in and to the parking garage were validly terminated under the Act. Defendants moved for summary judgment, claiming that (1) the garage was not property "serving" the condominium; (2) the board failed to join indispensable parties; (3) the board had released them from further suit in a prior agreement; (4) the Act did not apply to them because they were not "developers" under the Act; (5) the board's notice of termination was untimely; and (6) the prior state-court proceeding barred the board's claims under the doctrine of collateral estoppel. Schnurmacher and Infinity also brought counter-claims seeking costs and a declaratory judgment that the board's notice of termination was null and void and that Schnurmacher was the owner of the commercial unit in fee simple.

The district court dismissed the board's complaint, granted summary judgment for the defendants, and granted defendants' counterclaims. For the reasons set forth below, we affirm.

### DISCUSSION

Given that parking space in New York City is a scarce commodity, a parking garage in Manhattan can be a veritable gold mine. The Charles House parking garage, which occupies the lowest two levels of the building, provides the focus of this dispute. Since 1964 Schnurmacher has leased the garage to Gallery Garage, Inc., an independent contractor which has operated it as a public parking lot. Tenants of the building do not receive any special parking privileges by virtue of owning or leasing space in the building; however, they can lease parking spaces in the garage at daily, weekly, or monthly rates along with members of the general public.

Although Schnurmacher sold all of the residential units to Infinity, it kept for itself the commercial unit, which includes the garage. Therefore, when Infinity converted the building into a condominium, the garage was not amongst the properties it offered for sale. Schnurmacher leased the entire commercial unit to Madison in 1984. Because Madison merged into Infinity in late 1986, Infinity is now the lessee of the commercial unit. Infinity's lease is subject to pre-existing leases, including the lease to Gallery Garage. In addition, Infinity has an option to purchase the commercial unit in the future.

The gravamen of the board's complaint is that Schnurmacher and Infinity conspired to "divest[ ] the Condominium unit owners of the benefits of the Garage and * * * acted in concert to retain for themselves the substantial benefits of owning and controlling this valuable property which was intended by the Act to serve the unit owners." In an attempt to extinguish defendants' interests in the garage, the board sought to exercise powers granted under § 3607(a) of the Act by serving a notice of termination of several instruments upon the defendants. The board then filed this action seeking a declaratory judgment that the relevant instruments were in fact terminated under the Act.

The Act "represents an attempt by Congress to provide cooperative and condominium owners with certain minimum rights". *Park South Tenants Corp. v. 200 Central Park South Assocs.*, 941 F.2d 112, 114 (2d Cir.1991) (per curiam). By enacting § 3607, congress established a nonjudicial remedy for condominium associations and unit owners to terminate long-term, self-dealing contractual arrangements. *See West 14th St. Commercial Corp. v. 5 West 14th St. Owners Corp.*, 815 F.2d 188, 200 (2d Cir.), *cert. denied*, 484 U.S. 850, 108 S.Ct. 151, 98 L.Ed.2d 107 (1987). That section provides:

> Any contract or portion thereof * * * which—(1) provides for operation, maintenance or management of a condominium or cooperative association in a conversion project, or of property serving the condominium or cooperative unit owners in such

project; (2) is between such unit owners or such association and the developer or an affiliate of the developer; (3) was entered into while such association was controlled by the developer through special developer control * * *; and (4) is for a period of more than three years * * * *may be terminated without penalty by such unit owners* or such association.

15 U.S.C. § 3607(a) (emphasis added). All four elements must be present for condominium and cooperative owners or associations to terminate "self-dealing contracts". *West 14th St. Commercial Corp.*, 815 F.2d at 197.

The district court found the board's claims to be barred by collateral estoppel, untimeliness of notice of termination to defendants, and inapplicability of the Act to the instruments purported to be terminated. *See Board of Managers*, 825 F.Supp. at 610–16. Because we agree that the Act does not apply to this case, we need not discuss the district court's additional grounds for granting summary judgment to defendants.

None of the six instruments the board sought to terminate are "contract[s] * * * between [condominium or cooperative] unit owners or such association and the developer", as required by the Act. *See* 15 U.S.C. § 3607(a)(2). Four of them—the condominium offering plan, the declaration, the condominium by-laws, and the deed to the commercial unit—are not even contracts; they are unilateral documents. The remaining two—the lease and the option agreement—are not contracts involving the "unit owners or such association". A "contract is 'between'—hence binding on—only those who are parties to it". *West 14th St. Commercial Corp.*, 815 F.2d at 199. The lease, which was originally between Schnurmacher and Madison, is now between Schnurmacher and Infinity, and the option agreement is between Schnurmacher and Infinity. It is clear from the plain language of § 3607(a) that the documents at issue here do not fall within its purview. Therefore, the board's notice of termination served on the defendants was invalid.

The board recognizes that it is not a party to the lease and option agreements and that the offering plan, declaration, condominium by-laws, and deed to the commercial unit are not contracts, but advances several arguments in favor of applying the Act despite these shortcomings. First, the board argues that the Act should be liberally construed to effectuate a congressional intent to prohibit conduct like the defendants', because a narrow reading of the statute would unfairly permit developers to sidestep the statute. Second, the board urges that since the Act clearly bans contracts between a developer and a condominium association when the developer controls the association, it cannot reasonably be interpreted to allow functionally similar contracts between two developers that were entered into before the association came into existence.

Third, the board contends that unit owners should be able to terminate fee interests when those interests should have rightfully been transferred to the unit owners under the Act. Under this reasoning, a developer who fails to enter into a contract that it should have entered into would be subject to the Act in the same manner as a developer who has taken the formal step of actually entering into a forbidden contract. Fourth, the board urges that because the declaration and condominium by-laws are covenants that run with the land, they should be treated as contracts between Schnurmacher and all unit owners who subsequently purchase units in the condominium.

Fifth, the board argues that because Infinity paid a total of $4.5 million for its option on the commercial unit, the option agreement was in fact a disguised sale, and that Schnurmacher's actions with respect to the commercial unit constituted a "sale" within reach of the Act. Finally, the board claims that the intent and purpose of the Act require developers to convey all interests to the apartment owners irrespective of whether they are in fee, lease, or option form.

We are unpersuaded by these arguments. While we recognize that congress intended "to afford relief to unit-holders from the imposition of 'self-dealing' or sweetheart developer contracts," *West 14th St. Commercial Corp.*, 815 F.2d at 200, the board has not provided any authority supporting the expansive reading of the Act that it urges upon us.

To the contrary, congress has placed "significant restrictions" on the power of unit owners to exercise their termination right. *See Park South Tenants Corp.*, 941 F.2d at 114. We have previously refused to broaden the relief provided by the Act beyond its literal terms, *see id.*, and we adhere to that same position here.

This case differs in one significant respect from the body of caselaw relied upon by the board. Instead of conveying all of its interests in the property to the tenants and leasing back a portion of the commercial space, *see, e.g., 181 E. 73rd St. Co. v. 181 E. 73rd Street Tenants Corp.*, 954 F.2d 45, 45–46 (2d Cir.1992); *Cromwell Assocs. v. Oliver Cromwell Owners*, 941 F.2d 107, 108–09 (2d Cir. 1991); *2 Tudor City Place v. 2 Tudor City Tenants*, 924 F.2d 1247, 1249 (2d Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 83, 116 L.Ed.2d 56 (1991); *West 14th St. Commercial Corp.*, 815 F.2d at 190–91, Schnurmacher never conveyed its interest in the commercial space in the first instance. The termination provision of the Act was designed to prevent sponsors from binding *tenants* to long-term, self-dealing leases. *See 181 E. 73rd St. Co.*, 954 F.2d at 47–48. There is no danger of contravening that intent here, because these tenants are not bound to *any* arrangements with respect to the garage, much less long-term, self-dealing contracts.

Nevertheless, the board maintains that the Act requires Schnurmacher to convey the garage portion of the building to the unit owners and that Schnurmacher cannot reserve it for itself or its co-developer. However, neither the statute nor caselaw supports this contention. Nothing in the Act requires every portion of a building to be offered for sale when that building is converted to a condominium. By carving up the Charles House property into various "units" and retaining ownership of the commercial unit, Schnurmacher may well have kept the most profitable part for itself. Contrary to the board's contentions, however, this did not present a transaction that could be terminated under the power granted to tenants by the Act.

## CONCLUSION

The judgment of the district court is affirmed.