**WEST 14TH STREET COMMERCIAL CORP., West 14th Street Garage Corp. and West 14th Street Laundry Corp., Plaintiffs,**

v.

**5 WEST 14TH STREET OWNERS CORP., Defendant.**

No. 85 Civ. 5138 (WK).

United States District Court, S.D. New York.

Jan. 13, 1986.

Joseph L. Forstadt, Stroock & Stroock & Lavan, New York City, for plaintiffs.

Alan Warshauer, Galef & Jacobs, New York City, for defendant.

## MEMORANDUM & ORDER

WHITMAN KNAPP, District Judge.

Three separate but related corporations, West 14th Street Commercial Corporation, West 14th Street Garage Corporation and West 14th Street Laundry Corporation ("plaintiffs"), invoking our jurisdiction to interpret federal statutes, bring this action to enjoin defendant 5 West 14th Street Owners Corporation ("14th Street Corpora-

tion") from terminating certain contracts and leases. Now before us are cross motions for summary judgment and defendant's motion to dismiss the complaint. For reasons which follow, we grant plaintiff's motion for summary judgment.[1]

### The Parties

Defendant 14th Street Corporation is the cooperative owner of a 429 unit apartment house situated on the corner of Fifth Avenue and 14th Street in Manhattan. Its stockholders include persons owning about 85 percent of the building's units who purchased shares of capital stock and received proprietary leases when the building was converted to cooperative status on September 6, 1984. The occupants of the remaining units, having declined to purchase cooperative shares, remain as tenants under statutory leases protected by New York City's rent stabilization laws.

Each of the three plaintiff corporations is party to a lease or contract with defendant dated September 6, 1984. West 14th Street Commercial Corporation has a contract which, for a specified annual payment, authorizes it to lease to the public at any price it can obtain space for four stores on the building's ground floor. This lease is for a term of 20 years with an option to renew for another 20 years. West 14th Street Garage Corporation has a similar 20 year renewable lease authorizing it to operate a parking garage in the building. West 14th Street Laundry Corporation has a 15 year concession to provide and service washing machines and dryers for the use of building residents.

The defendant and each of the plaintiff corporations were created by Parker 14th Associates ("Parker" or "sponsor"), the original owner and builder of the apartment house, for the purpose of effectuating its conversion from rental to cooperative status.[2]

---

1. Although the respective affidavits before us contain much colorful and conclusory language impugning the integrity and veracity of the respective parties, no one has pointed to a specific material fact actually in dispute.

2. Parker also created a corporation known as Parman Company to act as sponsor for the conversion. For all purposes here relevant, Parker and Parman may be considered a single

## The Conversion

The entire process of converting the building from rental to cooperative status lasted from the spring of 1982, when the four mentioned corporations were created, to September 6, 1984, when defendant 14th Street Corporation received title to the building and issued shares of its capital stock and proprietary leases to purchasing tenants. Conversion was effected pursuant to applicable provisions of the Martin Act, New York General Business Law §§ 352-e *et seq.* (McKinney 1984), which governs all cooperative conversions in New York City.

A brief description of the Martin Act's comprehensive regulation of the conversion process will aid understanding of the facts in this case. The statute was enacted for the protection of "tenants in possession who do not desire or who are unable to purchase the units in which they reside from being coerced into vacating such units by reason of deterioration of services or otherwise into purchasing such units under the threat of immediate eviction." Legislative Findings, 1982 N.Y.Laws § 1, ch. 555. Particular protection is granted to persons sixty two years of age and older. Thus, the legislature found *(Ibid.)*.

> that in the City of New York the position of non-purchasing tenants who are sixty-two years of age or older is particularly precarious by reason of the limited financial resources of many such persons and the physical limitations of many such persons; that preventive action by the legislature in restricting rents and evictions during the process of conversion from rental to cooperative or condominium status is imperative to assure that such conversions will not result in unjust, unreasonable and oppressive rents and rental agreements affecting non-pur-

chasing tenants especially those who are sixty-two years of age or older, and other disruptive practices affecting all tenants during the conversion process which threaten the public health, safety and general welfare....

To address these issues, the statute provides two avenues by which an owner (such as Parker) can convert a building. The first, known as an "eviction plan", authorizes the conversion sponsor to convert the building and then cancel the leases of and force out non-purchasing tenants. At the time Parker was first contemplating conversion, that avenue required that the sponsor, as a condition precedent to declaring the plan effective, obtain from tenants written commitments for the purchase of 35 percent of the units in the building.[3] The second method, called a "non-eviction plan", reduces the required number of purchase commitments to 15 percent but imposes on the sponsor the obligation to honor the lease of any tenant who does not wish to purchase but elects to continue renting.[4]

The statute extends particular protection to senior citizens and disabled persons. Senior citizens are all persons over the age of 62 and their spouses. N.Y.Gen.Bus.Law § 352–eeee(1)(f). Disabled persons are those with a physical or psychological condition which prevents them from working and their spouses. § 352–eeee(1)(g). The statute mandates that any such person who elects within a given time not to purchase may not be evicted (even pursuant to an eviction plan). § 352–eeee(2)(d)(iii). In addition, the statute continues the applicability of any governmental regulation such as rent control or rent stabilization laws in effect at the time of conversion, § 352–eeee(2)(d)(iv), and directs that tenants whose leases are not so protected may not be charged rent increases above those

---

entity and will consequently be referred to interchangeably as "Parker" or "Sponsor".

**3.** The statute was amended in 1982 to raise the required number of purchase commitments to 51 percent. 1982 N.Y.Laws § 1, ch. 555.

**4.** This 15 percent purchase commitment can be made by tenants or bona fide purchasers who

represent that they will await vacancy of the unit purchased (i.e., await expiration of the lease of the tenant then in possession) and that they will use the unit as their personal or family residence. N.Y.Gen.Bus Law § 352–eeee(1)(b) (McKinney 1984).

charged for apartments in buildings with comparable services. § 352–eeee(2)(d)(iii).[5]

Parker's original intention was to avail itself of the provisions for an "eviction plan". It thus would have been required to obtain commitments for the purchase of 35 percent of the units in the building and would have been entitled to evict those who did not buy (except, of course, non-purchasing elderly or disabled tenants).

Upon learning of Parker's intention, the tenants immediately organized an association called the Tenants Unity Group ("Unity Group") to present Parker with a united front in the contemplated negotiations. Unity Group's purposes, set forth in its Articles of Association, were to disseminate to tenants information about the conversion, to hire lawyers and expert consultants, and "to secure unified action in advancing the common interests of its members."

Unity Group's first significant action was to persuade 65 percent of the tenants to enter into a "no-buy pledge" contract committing them to refrain from purchasing any apartment under an eviction plan.[6] Upon learning of this action, Parker abandoned all efforts to employ that form of conversion.

Parker's first formal offer—made under the non-eviction provisions of the Martin Act—was presented in July, 1982. This offer ("offering plan") was a comprehensive document setting forth all elements of the proposed conversion. Two of its provisions were of particular significance for present purposes. First, it provided that the proposed cooperative corporation's stock be issued to tenants at a price of $80.00 per share. At this price, a typical two-bedroom apartment would cost $85,920.00. Second, it proposed that the corporation enter into contracts with the three present plaintiffs for the above-described purposes. Under this proposal, the building would receive: (a) from West 14th Garage Corporation, a rent of $25,000 per year for the first five years, increments every five years thereafter, and an annual rent in the twentieth year of $31,000; and (b), from the West 14th Street Commercial Corporation, $50,000 per year for the first five years, increments every five years thereafter, and a final annual rent of $65,000. Had the plan been accepted, the building would have received from the two corporations a total of $75,000 in the first year and $96,000 in the twentieth.[7]

The first section of the offering plan was titled "Special Risks." It explained that these contracts might not be "arms-length" arrangements, that the cooperative corporation would likely receive from them less than the full market value of the permitted operations, and that Parker would correspondingly profit therefrom. Thus, it stated:

2. The Plan provides for leases of the garage-space and commercial space by the Apartment Corporation [defendant] to the Owner or a related entity [plaintiffs]. These leases may not be "arms-length" transactions and may result in the Apartment Corporation's realizing *less* than the full economic value of the garage-space and commercial space. The difference realized over the terms of such leases may be deemed additional profit to the Owner [Parker]. Furthermore, over the years the rent payable under these leases may become increasingly less than the said portion of the Apartment Corporation's aggregate

---

**5.** These provisions were contained as well in the version of the act which existed when Parker began considering conversion. Section 352–eeee(2)(a), 1979 N.Y.Laws Ch. 432, as amended 1981 N.Y.Laws Ch. 384.

**6.** Such a contract is enforceable in a court of law. *See, e.g., 227 East 12th St. Assn. v. 227 East 12th St. Tenants' Assn.* (S.Ct.N.Y.Co.) N.Y. L.J. Sept. 7, 1982, p. 7, col. 3; McKinney's Practice Commentary to Article 23–A of N.Y.Gen.

Bus.Law, "Real Estate Financing," § IV(c)(2) (1984).

**7.** Although defendant when terminating these two contracts cancelled the laundry concession as well, it appears that that concession was never mentioned in the parties' negotiations. It will not, therefore be again mentioned in this opinion.

costs in maintaining these spaces. (emphasis in original).

Only a handful of tenants elected to purchase under this offer, but it immediately sparked formal negotiations between Parker and Unity Group. Foremost among the issues upon which these negotiations centered was the price at which the tenants could purchase their apartments (i.e., the price per share of cooperative stock). Not surprisingly, the tenants wished to obtain the most favorable possible below-market "insider's price".

With respect to the challenged contracts, Unity Group expressed its outright opposition to their inclusion in any conversion plan, and otherwise sought, should their inclusion be unavoidable, to increase the revenues the cooperative corporation would receive under them. Prospective tenant purchasers obviously had a vital interest in this issue. If they succeeded in eliminating the contracts, the cooperative corporation would—as Parker had explained in its offering plan—increase revenues from the operations pre-empted by them and could apply that income to maintenance and other charges otherwise payable by tenants. By the same token, if the existence of the contracts were accepted, the loss of revenues to the cooperative corporation could nonetheless be minimized by increasing the payments required of plaintiffs. Parker, on the other hand, had a vital interest in that to the extent it could assure itself of future revenue from plaintiff corporations, it would be more willing to yield to the tenants' demand for lower prices for their apartments.

Aside from negotiations concerning these matters, there were discussions as to the size of the reserve fund that Parker would contribute to the cooperative, terms of downpayment, sponsor financing, covenants restricting the types of stores to be chosen under the commercial lease, and the terms of the sponsor's management agreement.

Without attempting a detailed account of the various negotiations which occurred, it is fair to say that each of the above consid-erations was taken into account in arriving at the final offering plan.

There were three major amendments to the plan. To declare the plan effective, Parker needed purchase commitments for 15 percent, or 65, of the building's units. Until the first amendment was made, Parker was able to obtain purchase commitments for only four units. After the first amendment commitments for 31 units were received. Parker was able to obtain the 15 percent commitment only after it had issued the third amendment.

The third and final amended plan reduced the original offering price per cooperative share by 40 percent to $49.90. At this price, the two bedroom apartment which would have cost $85,900 under Parker's original offer was to be sold for $53,-600. We are informed that the current market value for such an apartment is about $160,000. With respect to plaintiffs' contracts, the tenants were wholly unsuccessful in their efforts to eliminate them, but did succeed in increasing the revenue that the defendant corporation would receive therefrom. Thus, the initial rent to be received under the garage lease was raised from $25,000 to $44,000, with a final annual rent of $50,000. The base rent under the commercial lease was raised from $50,000 in the first year to $80,000, with a final rent of $95,000 (up from $65,000). In all, the tenants managed to increase income from these leases from $75,000 to $124,000 in the first year and $96,000 to $145,000 in the last. Further, the building reserve fund was increased from $50,000 to $650,-000, the downpayment required of purchasing tenants was reduced from 10 percent to $1,000, a covenant restricting the type of store that could share in the commercial lease was inserted, and Unity Group recovered from Parker $30,000 for counsel fees and engineering costs.

The manner in which the tenants viewed their bargaining position in these negotiations is revealed by various writings contemporaneously generated by Unity Group. One of the early—if not the first—general meetings of tenants conducted by Unity

Group was called for the purpose of discussing the news that Parker might propose an eviction plan. The formal minutes of that meeting described how a "no-buy" pledge could thwart that purpose, and went on to say that the Unity Group's general purpose was "to determine whether the building goes co-op, and if so, on whose terms." The relevant portion of those minutes provided (Minutes of January 30, 1981 Unity Group meeting):

A "NO–BUY" PLEDGE is an agreement signed by all tenants, stating that they will not buy their apartment unless certain specified conditions are met by the sponsor. The use of this "tool" shifts the balance of power back to the tenant because now a majority of them will be necessary—not a mere 35%—to determine whether the building goes co-op, and, if so, on whose terms. According to [Unity Group's counsel], anything and everything in the "red herring" [the offering plan] can be changed.

In furtherance of its stated objective to see that the conversion took place on the tenants' terms, Unity Group kept its membership advised of its objections to the various plans proposed as well as their best course of action. For example, with respect to the first amendment, Unity Group cautioned tenants not to be stampeded into signing subscription agreements because the price per share was still too high and the rents under the proposed contracts with plaintiffs still too low. Unity Group Letter dated May 22, 1983. Subsequently, Unity Group advised tenants that "[i]f we stick together and do not buy, the negotiating committee will have additional negotiating sessions. However, if a substantial number of tenants decide to buy, there will be no reason for Parker to improve the deal." Unity Group Letter dated June 14, 1983.

The third (or final) amended plan seemed to meet with Unity Group's approval. On September 16, 1983 it called a meeting of the tenants for the purpose of reviewing a proposal which Parker was preparing pursuant to a tentative agreement between it and Unity Group, and which seemed "very likely" to be "acceptable to the tenants." In its circular of the above date, Unity Group cautioned tenants to ignore any approaches from Parker until its new plan had been duly considered at the proposed meeting. The prediction that the new plan would be "acceptable" turned out to be accurate. By January 6, 1984, the last date under the Martin Act on which Parker could declare the plan effective or have it deemed abandoned, Parker had received purchase commitments for 154, or 36 percent, of the building's units.

Parker hesitated, however, to declare the plan effective because it desired more sales. Counsel for Unity Group, as well as Unity Group's president (now president of defendant corporation) assured Parker that close to 80 percent of the building's apartments would be purchased under the final amended plan. Upon that prediction, Parker on January 6, 1984 declared the plan effective. Within about three weeks, it received commitments for an additional 211 apartments, raising to 85 percent the number of apartments purchased under the final plan. In all, about 80 percent of the building's tenants chose to purchase their apartments.

Because of the provisions of the Martin Act, those tenants who did not elect to buy cooperative stock were nonetheless entitled to continue renting their apartments under their prior leases for as long as they wished. Such continued rental was governed, as it had been prior to conversion, by New York City's rent stabilization laws.

Because the mortgage on the building was federally insured, Parker could not effect the conversion without first obtaining the approval of the Department of Housing and Urban Development ("HUD"). HUD's review, so far as is here relevant, resulted in a requirement that its approval be sought before any leases were terminated or the garage rates raised. HUD also required Parker to substantiate that the proposed garage rates were not higher than those in the immediate area.

At the closing held on September 6, counsel for Unity Group, who had led the conversion negotiations from the beginning, examined the title, leases, and documents pertaining to conditions of conversion. Last minute changes and adjustments were made. According to the terms set forth in the offering plan as amended, Parker conveyed title of the building to defendant, whose Board of Directors had been designated by Parker upon its creation back in 1982, and defendant simultaneously issued to purchasing tenants shares and proprietary leases at agreed-upon prices and signed the contracts with plaintiffs provided for by the amended offering plan.

About one month after the closing, the defendant corporation held its first general shareholders meeting.[8] The existing Board of Directors requested ratification of all actions taken to date. This request was denied by shareholder vote. A new slate of directors was elected.[9] These included many of the leaders of Unity Group, including the head of that association who was elected president of defendant corporation.

On June 12, 1985, these directors, with the support of over two thirds of the defendant's shareholders, purported to cancel the contracts here at issue. This lawsuit followed.

### The Federal Statute

Defendant's purported cancellation of plaintiff's contracts was made in reliance upon Section 3607 of the Condominium and Cooperative Abuse Relief Act of 1980. 15 U.S.C. 3601 et seq. (1982). Section 3607, "Termination of Self-Dealing Contracts" provides—as its title indicates—for methods of relieving a newly created cooperative of self-dealing contracts into which it may have entered while the former owner was still in control. It provides in relevant part as follows (the most pertinent wording being emphasized):

(a) Any contract or portion thereof which is entered into after October 8, 1980, and which—

(1) provides for operation, maintenance, or management of a condominium or cooperative association in a conversion project, or of property serving the condominium or cooperative unit owners in such project;

(2) is between such unit owners or such association and the developer or an affiliate of the developers;

(3) was entered into while such association was controlled by the developer through [A] *special developer control* or [B] *because the developer held a majority of the votes in such association;* and

(4) is for a period of more than three years, including any automatic renewal provisions which are exercisable at the sole option of the developer or an affiliate of the developer, may be terminated without penalty by such unit owners or such association.[10]

Such termination must be approved by two-thirds of the units not owned by the developer or its affiliate, 15 U.S.C. 3607(c), and must occur within two years after "special developer control over the association is terminated." 15 U.S.C. 3607(b)(1). Such

---

**8.** The date of this meeting had been fixed by the offering plan.

**9.** The offering plan had provided that such directors be elected at the first shareholders meeting.

**10.** The "cooperative association" referred to is defined as (15 U.S.C. 3603(9)):

[the] organization that owns the record interest in the residential cooperative property or a leasehold of the residential property of a cooperative project and that is responsible for the operation of the cooperative project.

A "cooperative unit owner" is (15 U.S.C. 3603(13)):

the person having a membership or share interest in the cooperative association and holding a lease, or other muniment of title or possession, of a cooperative unit that is granted by the cooperative association as the owner of the cooperative property.

"Special developer control" is (15 U.S.C. 3603(22)):

any right arising under State law, cooperative or condominium instruments, the association's bylaws, charter or articles of association or incorporation, or power of attorney or similar agreement, through which the developer may control or direct the unit owners' association or its executive board....

termination is effective 90 days after parties to the contract are given notice. 15 U.S.C. 3607(d).

The statute was enacted to remedy certain abuses in conversions of rental housing into condominiums and cooperatives. Specifically, Congress found that (15 U.S.C. 3601(a)):

1) there is a shortage of adequate and affordable housing throughout the Nation, especially for low-and moderate-income and elderly and handicapped persons;

2) the number of conversions of rental housing to condominiums and cooperatives is accelerating, which in some communities may restrict the shelter options of low- and moderate-income and elderly and handicapped persons;
   . . .

Congress accordingly sought through the statute (15 U.S.C. 3601(b))

. . . . to seek to minimize the adverse impacts of condominium and cooperative conversions particularly on the housing opportunities of low- and moderate-income and elderly and handicapped persons, [and] to assure fair and equitable principles are followed in the establishment of condominium and cooperative opportunities

\*        \*        \*        \*        \*        \*

The legislative history illustrates the sort of evil the statute, of which section 3607 is a part, was meant to cure. Senator Williams, in the context of discussing the Congressional conference committee's action on the proposed statute, stated that the section was prompted by the humanitarian consideration of relieving tenants, particularly the elderly, from being forced to relocate because of a conversion, which relocation sometimes took several months. 126 Cong.Rec. § 13948 (daily ed. Sept. 30, 1980). This concern with the displacement of tenants was echoed by Representative Reuss, who noted that there was nothing wrong with a conversion which did not so displace tenants but which allowed them to remain until they relocated for other rea-

sons. 126 Cong.Rec. H 10095 (daily ed. Sept. 30, 1985).

## DISCUSSION

The basic question presented by this lawsuit can be simply stated. Should the occupants of 5–19 West 14th Street, having spent over a year reaching an agreement with their landlord on the price at which and the terms under which they were willing to give up the protection of New York City's rent laws and become the building's owners, be allowed to repudiate such agreement as soon as they had acquired title pursuant to its terms? Plaintiffs advance two reasons for answering that question in the negative. First, they contend that the thrust of the Condominium and Cooperative Abuse Relief Act of 1980 (the "Act"), 15 U.S.C. 3601 et seq., is to prevent tenants—especially the elderly and disabled—from being deprived of shelter, and that it is therefore inapplicable to the instant non-eviction conversion where no tenant could have been so deprived. Second, they assert that section 3607 is by its terms inapplicable to the contracts here involved. For reasons which follow, we reject the first contention but accept the second.

■ Plaintiffs' first argument is indeed an attractive one. There can be no doubt that the main purpose behind the Act was to protect tenants—especially the aged and disabled—from being deprived of shelter by cooperative or condominium conversions. It is also clear that no tenant—whether elderly and disabled or youthful and robust—was or could have been so deprived in the conversion before us. However, in section 3607 Congress departed from its declared principal purpose, and focused on protecting newly formed cooperative corporations rather than their individual tenants. That section seeks to protect such entities from self-dealing contracts entered into when the landlord (or "sponsor") is still in control of their destinies. Attractive though it may be, we must therefore reject plaintiffs' first argument.

■ Turning to the applicability of the section invoked, its title indicates that it was intended to apply only to "self-dealing" contracts. The definitions set forth in subdivision (a)(2) make clear that its substantive provisions deal only with contracts "between" the sponsor or its affiliates and unit owners (defined in section 3603(13) as owners of cooperative association stock and holders of proprietary leases granted by it) or the cooperative association (defined in section 3603(9) as the organization owning the record interest in the cooperative property and responsible for its operation), while subdivision (a)(3) specifies that the contracts must have been "entered into" while the developer (Parker) controlled the cooperative association.

The instant contracts meet none of these criteria.[11] They were in no sense "self-dealing" but, as above indicated, were the result of arms-length bargaining conducted over the period of more than a year.[12]

Nor were they in any realistic sense between Parker and the defendant corporation as such or its unit owners. As to the latter, there were no unit owners at the time the contracts were executed because shares of the corporation did not exist until the moment the contracts came into being.

Similarly, the defendant corporation as such played no part in negotiating or executing the contracts. The contracts came into being as a result of the pre-existing negotiations between Parker on the one hand and Unity Group representing the tenants on the other. These negotiations were ratified at the closing when Parker conveyed title to the defendant corporation and 80 percent of the tenants purchased shares in that corporation pursuant to the previously negotiated arrangements.[13] Neither defendant corporation nor plaintiff corporations, as such, participated in the closing which gave birth to contracts here in issue. We consequently conclude that the statute does not apply to this particular transaction.

Should we assume *arguendo* that the contracts were—despite the nature of their origin—deemed to be "between" Parker and the defendant corporation, we would have to consider whether the provisions of section 3607(a)(3) had been met. Since no one has ever contended that Parker ever held a "majority of the votes" in the defendant corporation, the question narrows down to whether Parker exercised "special developer control" as defined in subdivision 22 of section 3603. That section specifies that

---

11. Because of this ruling, we do not consider plaintiffs' argument that the requirements of subdivision (a)(1) have also not been met.

12. The parties devote a great deal of argument to the wholly irrelevant question of whether the sponsor or the tenants had the better bargaining position. Their respective bargaining positions were reflected in the bargain ultimately struck. As a practical matter, such positions were a function of the respective parties' desire to be rid of or to retain the restrictions of New York City's rent regulations.

Furthermore, although not here applicable, the statutory provisions for termination of unconscionable leases in the companion section to the one here relied upon, 15 U.S.C. 3608, offer guidance into the factors we should consider in determining whether the contracts were self-dealing. Among them are the commercial setting of the negotiations, 15 U.S.C. 3608(c)(1), and whether any person has knowingly taken advantage of another. 15 U.S.C. 3608(c)(2). Relevant evidence would include that as to the

"adequacy of disclosure of the [contract's] terms", Comments of Senator Williams, 126 Cong.Rec. S. 13949 (daily ed. Sept. 30, 1980). The contracts here were fully and forthrightly disclosed on page one of the offering plan, and were the subject of extensive and serious negotiations between Parker and the legal representative of an organized tenants association for over a year. They could hardly under such criteria be deemed self-dealing.

13. Although purchasing tenants and Parker behaved as though they had a binding contract as soon as subscription agreements were signed, and the plan declared effective, it cannot be said that the contracts had been made at that time. Under the offering plan, Parker reserved the right to amend its terms any time before or after it was declared effective (and prior to the closing) so long as purchasing tenants were given the option of reaffirming or cancelling their agreements. Offering Plan at section BB(5)(a)(b). The subscription agreements thus were not binding contracts for want of mutuality.

such control must arise under state law, under the corporation's charter or by-laws, under a power of attorney or similar instrument, or under "cooperative or condominium instruments." It is apparent that with the possible exception of "cooperative or condominium instruments", none of the foregoing criteria are met. The term "cooperative or condominium instrument" being nowhere defined, it could be argued that because the offering plan specified that the pro forma directors originally designated by Parker at the corporation's birth should continue in office until the first meeting of shareholders, the criteria of section 3603(22) had been met.

Such an interpretation would exalt form over substance to an absurd degree. There was no causal relationship between the identity of defendant's directors and the existence of these contracts. Had Unity Group insisted upon amending the offering plan to provide that its own executive committee should become the defendant's directors at the moment of closing, such directors could not have prevented the execution of the contracts. They would have been faced with the choice of accepting from Parker title to the building on terms which had been agreed upon or presiding over a shell corporation with no assets. We decline to assume that Congress contemplated the absurd result of having substantive rights turn upon such a fortuitous and wholly meaningless circumstance. *See Commissioner of Internal Revenue v. Brown* (1965) 380 U.S. 563, 571, 85 S.Ct. 1162, 1166, 14 L.Ed.2d 75 (courts should avoid construing statutes to produce absurd results); *Guiseppi v. Walling* (2d Cir. 1944) 144 F.2d 608, 624 (L. Hand, J.) (court's task is to predict what legislature would have done had it been presented with situation under review).

We accordingly deny defendant's motions and grant summary judgment for plaintiffs. Plaintiff shall submit a judgment on ten days notice.

SO ORDERED.