**BRABERT REALTY CO., Plaintiff,**

v.

**20125 OWNERS CORP., Defendant.**

**No. 86 Civ. 5977(PNL).**

United States District Court,
S.D. New York.

Jan. 18, 1989.

---

Stroock & Stroock & Lavan, New York City (Robert J. Zastrow, Alyssa Walden, of counsel), for plaintiff.

Galef & Jacobs, New York City (Alan Warshauer), of counsel, for defendant.

## OPINION AND ORDER

LEVAL, District Judge.

Plaintiff, Brabert Realty Co. ("Brabert") moves under Rule 56, Fed.R.Civ.P., for summary judgment voiding a Notice of Termination of Lease served on it by defendant 20125 Owners Corp. ("Owners Corp."). Defendant cross-moves for summary judgment enforcing the asserted Termination of Lease and dismissing the complaint.

*Background*

The action arises from the conversion of a residential apartment building located at 201 East 25th Street, New York, from rental property to cooperative ownership, on May 15, 1984. Plaintiff Brabert was the former owner and sponsor of the conversion. Owners Corp. became the new owner of the building. Under a Master Lease ("Lease") executed that day, Owners Corp. leased to Brabert an indoor parking garage in the basement of the building ("Garage") and a store facing Third Avenue (the "Commercial Space").[1] The Lease was for an initial term of twenty-five years, with an option to renew for a second twenty-five year term, at an annual rent of $100,000. The Lease does not allocate the $100,000 rent as between the Commercial Space and the Garage.

At the time Owners Corp. entered into the Lease, it was controlled by Brabert through nominees he had appointed as officers and directors. Over five weeks later, on June 27, 1984, the shareholders elected a new board of directors, replacing those appointed by Brabert at the time of conversion, so that Owners Corp. was no longer controlled by the sponsor.

On May 28, 1986, Owners Corp. served notice that it had elected, by a vote of more than 89% of the eligible shareholders, to terminate the Lease. Brabert brought this suit challenging the validity of the termination.

*Discussion*

The question whether the lease termination is valid is governed by the Condominium and Cooperative Abuse Relief Act of 1980, 15 U.S.C. §§ 3601–3616 ("the Act"), which was enacted to confer protections on tenants in the cooperative conversion process. *See* H.R. Conf. Rep. No. 96–1420, 96th Cong., 2d Sess. 4 *reprinted in* 1980 U.S.Code Cong. & Admin.News 3506, at 3707. Section 3607(a) of the Act provides cooperative apartment owners with a method of terminating certain long

---

1. Brabert has subleased the Commercial Space to a D'Agostino Brothers supermarket and the Garage to Manhattan Parking, for more than it pays to Owners Corp.

**316**

term self-dealing arrangements by sponsors or developers. It provides as follows:

**Operation, maintenance, and management contracts; penalty**

(a) Any contract or portion thereof ... which

> (1) provides for operation, maintenance, or management of a condominium or cooperative association in a conversion project, or of property serving the condominium or cooperative unit owners in such project;
>
> (2) is between such unit owners or such association and the developer or an affiliate of the developer;
>
> (3) was entered into while such association was controlled by the developer through special developer control or because the developer held a majority of the votes in such association; and
>
> (4) is for a period of more than three years, including any automatic renewal provisions which are exercisable at the sole option of the developer or an affiliate of the developer,

may be terminated without penalty by such unit owners or such association.

(b) [a]ny termination under this section may occur only during the two-year period beginning on the date on which—

> (1) special developer control over the association is terminated; or
>
> (2) the developer owns 25 per centum or less of the units in the conversion project, whichever occurs first.

15 U.S.C. § 3607(a), (b).

This case raises two issues: whether the termination of the Lease occurred within the applicable statute of limitation, 15 U.S.C. § 3607(b); and whether this Lease is terminable under the Act. 15 U.S.C. § 3607(a).

### I.

■ The timeliness of the termination turns on whether it occurred within two years of the end of "special developer control." [2] Special developer control is defined in Section 3603(22) of the Act as

> any right arising under State law, cooperative or condominium instruments, the association's bylaws, charter or articles of association or incorporation, or power of attorney, or similar agreement, through which the developer may control or direct the unit owners' association or its executive board.

15 U.S.C. § 3603(22).

Brabert argues that special developer control ended on May 15, 1984, the date the building was converted, more than two years prior to the June 27, 1986 Notice of Termination of Lease. Owners Corp. contends that Brabert continued to hold special developer control until the first meeting of shareholders on June 27, 1984, when a new board was elected to replace the sponsor's nominees. Defendant's argument is supported by the terms of the Offering Plan,[3] the By-laws of Owners Corp.,[4] and Section 404 of the Business Corporation Law of the State of New York.[5]

I find no basis for plaintiff's contentions. Until the June 27, 1984 election of new

---

**2.** Because Brabert continued to own 25 percent of the units after June 27, 1984, special developer control under subsection (1) of Section 3607(b) controls the limitation issue.

**3.** The Offering Plan provided that the officers and directors selected by Brabert
> will resign in favor of directors elected by the shareholders at a meeting to be held approximately 30 days after the closing....
> [T]he holders of the Unsold Shares [Brabert] will not constitute a majority of or control the Board of Directors immediately after the first meeting of shareholders following the closing....

**4.** The By–Laws of Owners Corp. provides that the first meeting of shareholders is to be held

within 30 days after closing under the Offering Plan. Such meeting could not have been held on May 15, 1984, because at that time there was no list of shareholders and no ten day notice, as required by the Business Corporation Law of New York.

**5.** Section 404 of the New York Business Corporation Law states that
> (a) After the corporate existence has begun, an organization meeting of the incorporator or incorporators shall be held within or without this state, for the purpose of adopting by-laws, electing directors to hold office until the first annual meeting of shareholders ... and the transaction of such other business as may come before the meeting....

directors, Brabert in fact controlled the board through its nominees. This constituted special developer control. Accordingly, the Lease "was entered into while such association was controlled by the developer through special developer control," and the termination of the Lease on May 28, 1986 occurred within two years of the end of special developer control. *See 181 East 73rd Street Co. v. 181 East 73rd Tenants Corp.*, 87 Civ. 3362 (RO) (S.D.N.Y. April 27, 1988) [1988 WL 45634] (at the time the tenants elected a new board of directors replacing those appointed by the sponsor, Tenants Corp. was no longer controlled by the sponsor). The termination was timely.

## II.

◼ The second issue raised is whether the Garage and Commercial Space is "property serving the ... cooperative unit owners." Only contracts affecting such property are terminable under the Act. In *West 14th Street Commercial Corp. v. 14th Street Owners Corp.*, 815 F.2d 188 (2d Cir.), *cert. denied*, —— U.S. ——, 108 S.Ct. 151, 98 L.Ed.2d 107 (1987), the Court of Appeals considered whether termination of leases for an on-site garage (which was open to the public but with preferences for the owners), a laundry room, and four retail establishments fell within the scope of Section 3607. The court held that "[a] parking garage, with or without tenant preferences, provides a service that tenants might reasonably expect as an essential adjunct of their apartment complex." *Id.* at 198–99. Thus, the garage lease was found to be a contract for "property serving" the unit owners within the meaning of the Act, and therefore properly terminable. The four retail stores open to the public, however, were found not to be "property serving" the unit owners, and therefore not terminable under the Act. That ruling controls this controversy.

This case presents a Lease a portion of which, covering the Garage, is properly terminable under Section 3607, and a portion covering the Commercial Space is not.

Plaintiff argues that the Notice of Termination should be declared invalid because a portion of the Lease is not properly terminable under the Act. Defendant argues that, because the terminable and the non-terminable were inseparably mixed together, the entire Lease is subject to termination.

Plaintiff relies on *King v. 415 Second Owners Corp.*, 86 Civ. 4800 (JMW), —— F.Supp. ——, (S.D.N.Y. Oct. 14, 1987), and *Cromwell Associates v. Oliver Cromwell, Inc.*, 87 Civ. 784 (JMC) 705 F.Supp. 116, (S.D.N.Y. July 11, 1988), for the proposition that a notice of lease termination is void if it seeks to terminate a lease covering both terminable and non-terminable premises. Those authorities may be distinguishable— *Cromwell* on the ground that the statute of limitations had not yet run at the time of the decision so that the cooperative association retained the opportunity to terminate "portions" of the master lease, and *King* on the ground that the issue of partial enforcement was not argued to the court. In any event, I decline to follow those decisions.

The Act recognized, and undertook to remedy the serious potential for abuse that arises during the course of conversion when the sponsor, exercising temporary "special developer control" of the cooperative association, can enter into self-dealing leases below market that will deprive the association of valuable assets. Had the sponsor entered into the self-dealing leases prior to conversion, they would be immune to termination under the Act and appropriately so because the association would have clear prior notice that such premises were not part of the assets it was acquiring in the conversion. If, on the other hand, such self-dealing leases are made on behalf of the association after conversion by the sponsor acting through special developer control, this can deprive the association of assets on which its members may have reasonably relied on in the conversion process.[6] The Act seeks to protect cooperative

---

**6.** In *West 14th Street* the Court ordered termination notwithstanding that negotiation of the

terms of the leases between the developer and tenants' representatives had preceded the con-

associations from such self-dealing in their name by providing for termination of such leases within limits.

Although such self-dealing contracts have the same detrimental economic effect on the association regardless of the character of the premises affected, the Act strikes a somewhat arbitrary compromise, providing the right of termination only as to leases (or other contracts) "of property serving the ... cooperative unit owners in such project."

■ When the sponsor has structured the self-dealing lease covering both terminable and non-terminable leaseholds, creating a circumstance not directly addressed by the Act, three interpretations are possible. Either the termination is void, as *Cromwell* and *King* found, because it purports to terminate a non-terminable contract; or it is effective in terminating both the covered and the non-covered premises; or the termination is effective only as to the terminable premises, requiring the court to allocate the rental as between the terminable and the non-terminable premises.[7]

To allow sponsors to escape termination merely by structuring the self-dealing contract to convey indistinguishably covered and non-covered property would substantially defeat the remedial purpose of the Act. Because it was the sponsor who chose to engage in the voidable self-dealing transaction and chose to combine the transaction with an equally self-dealing but non-voidable one, I find, unlike *Cromwell* and *King*, that the remedial purpose of the Act requires either the second or the third solution—in either case voiding the transaction which the Act makes voidable. Otherwise the sponsor would have the ability to escape the Act's protections against unfair self-dealing simply by imaginatively ex-

tending the self-dealing to uncovered premises.

Whether the solution should be the second or third, whether either the sponsor or the association should be permitted to elect between them, and how rent should be allocated are certainly not clear under the Act.

Because in the initial briefing scant attention has been given to these questions, I will direct a further round of briefing of this issue.

### Conclusion

Plaintiff's motion for summary judgment is denied. Defendant's motion is deferred pending briefing of whether the termination is effective as to the Garage only, or also as to the Commercial Space, and, if so, how Brabert's rent should be allocated between them. Briefs shall be submitted three weeks from the date of this order; reply briefs, if desired, a week thereafter.

SO ORDERED.

---

version. The Court found it was the intention of the statute to afford the relief of termination notwithstanding such prior negotiation, because of the high potential for abuse in such self-dealing arrangements and the questions that are likely to arise as to whether the negotiations were based on complete information.

7. It is certainly not clear how such allocation should be done. The method that seems best to carry out the purpose of the Act to protect the owners association from unfair sponsor self-dealing would be to find the fair market value of the lease of non-terminable property and allocate to the rental obligation up to that amount, attributing the remainder to the terminable portions.