**COLISEUM PARK APARTMENTS COMPANY and Professional Office Leasing Associates, Plaintiffs,**

v.

**COLISEUM TENANTS CORPORATION, Defendant.**

No. 89 Civ. 6981 (PKL).

United States District Court, S.D. New York.

July 12, 1990.

Rogers & Wells, New York City (James J. Maloney, Hector Gonzalez, of counsel), for plaintiffs.

Weisman, Celler, Spett & Modlin, New York City (John B. Sherman, of counsel), for defendant.

## ORDER & OPINION

LEISURE, District Judge:

Plaintiffs Coliseum Park Apartments Company (the "Developer") and Professional Office Leasing Associates (the "Tenant") (collectively, "plaintiffs") bring this action for injunctive and declaratory relief seeking to prevent defendant Coliseum Tenants Corporation (the "Association") from termi-

nating a lease (the "Commercial Lease" or the "Lease") pursuant to the Condominium and Cooperative Abuse Relief Act of 1980, 15 U.S.C. § 3601 *et seq.* Plaintiffs have filed a motion for summary judgment pursuant to Fed.R.Civ.P. 56 on counts I, II, and VII of the complaint, claiming that the Act does not authorize defendant to terminate the Lease under the pending circumstances, and that even if the Act did authorize the termination, defendant terminated the Lease in an improper and untimely fashion.

## BACKGROUND

The Condominium and Cooperative Abuse Relief Act of 1980, 15 U.S.C. § 3601 *et seq.* (the "Act") was passed by Congress in order to allow cooperative associations to terminate under certain circumstances abusive and self-dealing leases and contracts.[1] The Act permits the unit owners or an association of unit owners to terminate without penalty any contract which (1) provides for the operation or maintenance of a condominium or cooperative; (2) is between the unit owners or any association of unit owners and the developer or an affiliate of the developer; (3) was entered into while the developer controlled the association; and (4) is for a period of more than three years. 15 U.S.C. § 3607(a). Termination pursuant to § 3607(a) must occur within two years of the date on which "special developer control," as defined in the statute, over the association ends, or the developer owns 25% or less of the units in the cooperative, whichever occurs first. 15 U.S.C. § 3607(b). Termination must be approved by two-thirds of the units other than any of the units owned by the developer. 15 U.S.C. § 3607(c).

The principal question raised by plaintiffs' motion for partial summary judgment is whether the Commercial Lease is "be-

---

1. The Act was "enacted to protect the rights of tenants whose residential apartment buildings are converted to cooperatives or condominiums. Realizing that many tenants are too unsophisticated on account of age or infirmity to evaluate properly the complex choices offered them upon conversion, Congress sought to alleviate developer abuses during the conversion process.

At the same time Congress recognized that developers deserve a fair return on their investment. Yet when a developer's profit is unconscionable, it comes at the tenants' expense. Thus, the scope of the Act must be determined in light of these concerns." *West 14th Street Commercial Corp. v. 5 West 14th Street Owners Corp.*, 815 F.2d 188, 190 (2d Cir.1987).

tween" the Tenant, which is an affiliate of the Developer, and the Association in satisfaction of § 3607(a)(2). As will be discussed below, the Association is not an original party or a signatory of the Lease, and only assumed the duties of landlord under the Lease upon conversion of the properties. In addition, plaintiffs argue that many of the unit owners voted for termination of the Lease by proxy, which is not explicitly authorized by the Act, and that the vote for termination was untimely in violation of § 3607(b). In light of this overview of the relevant legal framework, the Court will now summarize the facts relevant to the pending motions.

Prior to the process of cooperative conversion, the Developer owned commercial and residential property located at 345 West 58th Street and 30 West 60th Street in Manhattan. The Developer had leased out to various tenants four office spaces, a garage, and storage space located at those properties. Affidavit of Bernard Aisenberg, sworn to on January 8, 1990, ¶¶ 4-5 ("Aisenberg Aff.").[2] On September 17, 1985, the Developer entered into the Commercial Lease with the Tenant, thereby leasing to the Tenant the office, garage, and storage spaces described above, and assigning to the Tenant its interests in the leases previously entered into for those spaces. Aisenberg Aff., ¶ 6. The Developer and the Tenant are closely affiliated entities, managed by the same general partners, and with overlapping groups of limited partners. Aisenberg Aff., ¶ 2.

The Commercial Lease entered into by the Developer and the Tenant provided for a four-year term commencing on October 1, 1985, with the option for automatic renewal by the Tenant for nine consecutive five-year periods. Aisenberg Aff., ¶ 7. For the first three years of the Lease, the Tenant paid the Developer $165,000 per annum, with an increase of 7.77% of the rise in certain operating expenses for each succeeding three-year period. The rent payable by the actual tenants of the spaces to the Tenant was $388,239.84 per annum as of May 1986, or $223,239.84 more than the sum owed to the Developer. Affidavit of Robert Seidelman, sworn to on February 20, 1990, ¶ 6 ("Seidelman Aff.").[3]

In May 1986, the Developer filed the Amended and Restated Offering Plan (the "Offering Plan"), and thereby commenced the process of conversion of both the commercial and residential properties to cooperative ownership. The Offering Plan disclosed to prospective purchasers that the transfer of title to the property was subject to the Commercial Lease, discussed the material provisions of the Lease, and set forth the relevant provisions of the Act. Aisenberg Aff., ¶ 8. On December 15, 1986, the conversion was completed, and the Developer transferred its leasehold interests in the property to the Association. Simultaneously, Circle Land Corp., the holder of the fee estate in the property, transferred the fee estate to the Association, and the leasehold interest and the fee estate were thereby merged in the possession of the Association. Seidelman Aff., ¶¶ 7-8.

At the time of conversion, all of the Directors of the Association were nominees and agents of the Developer, and the Developer owned a majority of shares in the Association. The Developer continues to own more than 25% of the shares of the Association. In addition, pursuant to the Offering Plan, each proprietary cooperative lease agreement contains explicit provisions granting the Developer substantial powers over the Association. Seidelman Aff., ¶ 11.

On June 28, 1989, the Board of Directors of the Association formally notified all shareholders possessing proprietary cooperative leases that a special shareholders' meeting would be held on July 27, 1989, to vote on whether to terminate the Commercial Lease pursuant to the Act. Seidelman Aff., ¶¶ 12-13. The Association did not formally notify the Developer and the Tenant of the meeting. Such notification is not required by the Act, as only the actual unit owners are authorized to vote on termi-

---

2. Bernard Aisenberg is a general partner of both the Developer and the Tenant.

3. Robert Seidelman is President and a member of the Board of Directors of the Association.

nation of a lease under these circumstances. *See* 15 U.S.C. § 3607(c); Seidelman Aff., ¶ 13. Two-hundred forty of the 316 unit owners cast votes either by ballot or by proxy. Two-hundred thirty-nine shareholders voted to terminate the Commercial Lease, and one shareholder abstained. Seidelman Aff., ¶ 15. The Association then notified the Tenant that the Lease would be terminated as of December 15, 1989. With the filing of this lawsuit, the parties have stipulated to continue operations under the Lease until the relevant legal disputes are resolved.

## DISCUSSION

### A. Standard for Summary Judgment

Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." " 'Summary judgment is appropriate when, after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party.' " *Horn & Hardart Co. v. Pillsbury Co.*, 888 F.2d 8, 10 (2d Cir.1989) (*quoting Murray v. National Broadcasting Co.*, 844 F.2d 988, 992 (2d Cir.), *cert. denied*, 488 U.S. 955, 109 S.Ct. 391, 102 L.Ed.2d 380 (1988)).

The substantive law governing the case will identify those facts which are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will probably preclude the entry of summary judgment.... While the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are crucial and which facts are irrelevant that governs." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there does indeed exist a genuine issue for trial." *Id.* at 249, 106 S.Ct. at 2510; *see also R.C. Bigelow, Inc. v. Unilever N.V.*, 867 F.2d 102, 107 (2d Cir.), *cert. denied sub nom. Thomas J. Lipton, Inc. v. R.C. Bigelow, Inc.*, ⸺ U.S. ⸺, 110 S.Ct. 64, 107 L.Ed.2d 31 (1989). The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion" and identifying which materials it believes "demonstrate[ ] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *see also Trebor Sportswear Co. v. Limited Stores, Inc.*, 865 F.2d 506, 511 (2d Cir.1989). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex, supra*, 477 U.S. at 325, 106 S.Ct. at 2553. As the essential facts of the case related to the pending motions are undisputed, the Court is well positioned to decide plaintiffs' motions for summary judgment on the first, second, and seventh counts of the complaint.

### B. Motion for Summary Judgment on Count I

In the first count of the complaint, plaintiffs allege that "[n]either the Association nor any of its unitholders is a party to the Commercial Lease... [and] [t]he Commercial Lease is, therefore, not a contract within the meaning of Section 3607(a)(2)." Complaint, ¶ ¶ 51–52. Plaintiffs emphasize that the Commercial Lease was negotiated and signed by the Developer and the Tenant, and that only upon conversion did the Developer transfer its interests in the Lease to the Association. Plaintiffs argue that the Association never affirmatively assumed the entirety of the Developer's interests in the Lease, and thus that the Association is not a party to the Lease as required by the Act.

The Association argues in response that it automatically became a party to the Lease upon conversion, and therefore possesses the power to terminate the Lease

pursuant to the Act. The Association points to the following language in section 33.01 of the Commercial Lease itself:

33.01. The term "Landlord", as used in this Lease, means only the then owner of the Demised Premises, so that in the event of any sale or conveyance of the Demised Premises, both of which are expressly permitted, the seller shall be and hereby is entirely freed and relieved of all covenants and obligations of Landlord hereunder thereafter arising, and it shall be deemed and construed, without further agreement between the parties and the purchaser or grantee of the Demised Premises that such purchaser or grantee has assumed and agreed to carry out any and all covenants and obligations of Landlord hereunder....

The Association argues that this language caused the Association to become automatically a party to the Commercial Lease within the meaning of the Act when it received the leasehold interest in the properties from the Developer. The Association also emphasizes that, since conversion, it has carried out all the duties of Landlord under the Lease, and that plaintiffs' characterization of the transaction leads to the absurd result that there is at present only one party to the Lease, the Tenant.

## 1. Federal Law

■ Plaintiffs put forward extensive arguments based on New York State law to demonstrate that the Association is not a party to the Commercial Lease. However, the Court believes the applicability of § 3607 should not vary with the laws of contract and real property in the different states. *See Cromwell Associates v. Oliver Cromwell Owners, Inc.*, 705 F.Supp. 116, 117–18 (S.D.N.Y.1988) (rejecting the use of a city zoning ordinance to define "property serving the ... cooperative unit owners" under § 3607(a)(1) of the Act, and finding that "Congress clearly intended to promulgate a uniform standard for use in evaluating terminations of contracts and leases under the Act."). The Court is only bound, therefore, by the scant federal jurisprudence interpreting the provisions of the Act.

In *West 14th Street Commercial Corp. v. 5 West 14th Street Owners Corp.*, 815 F.2d 188 (2d Cir.1987), a developer filed a plan for cooperative conversion which included three proposed leases for portions of the property. Upon conversion, each lease would be entered into between a developer-affiliated corporation as tenant, and Owners Corp., the cooperative association created and initially controlled by the developer. In response, the current tenants formed the P.G. Tenant's Unity Group ("Unity Group") and collected no-buy pledges with regard to the developer's first offer of conversion. The developer was thereby compelled into negotiations with Unity Group over the terms of the three leases. When the terms became satisfactory to a sufficient number of the tenants, conversion took place. Soon after conversion, the tenants elected independent directors of Owners Corp., and Owners Corp. voted to terminate the three leases pursuant to the Act.

The three developer-affiliated tenants subsequently filed suit in district court alleging, *inter alia*, that Owners Corp. was not a party to the lease within the meaning of § 3607(a)(2), and that therefore Owners Corp. could not terminate the lease pursuant to the Act. The district court agreed, holding that even though the leases were formally entered into and signed by Owners Corp. and the developer, the party which had actually negotiated the leases with the developer was Unity Group. The leases, therefore, were not contracts "between" Owners Corp. and the corporate tenants in accordance with § 3607(a)(2), and Owners Corp. could not terminate the leases pursuant to the Act. *See West 14th Street Commercial Corp. v. 5 West 14th Street Owners Corp.* 625 F.Supp. 934, 942 (S.D.N.Y.1986) (Knapp, J.).

The Second Circuit reversed the District Court, ruling that "a contract is 'between' —hence binding on—only those who are parties to it, as evidenced by their signatures. On this ground, only Owners Corp. and the developer as signatories, and not Unity Group, are parties to the contracts. Logically, the contracts could not be 'between' Unity Group and the developer be-

cause Unity Group is not a party to them." *West 14th Street Commercial Corp., supra*, 815 F.2d at 199–200. Plaintiffs argue that this language controls the case at bar, and that the Association, as a non-signatory to the Commercial Lease, is not a party to the Lease within the meaning of the Act.

The Association argues, and the Court agrees, that the language of the Second Circuit in *West 14th Street Commercial Corp.* should be not read as permitting only actual signatories to self-dealing leases to terminate those leases under the Act. The fundamental inquiry of the Second Circuit concerned the identity of the parties to the leases. The Court ascribed such identity to Owners Corp. and the developer, "as *evidenced* by their signatures" (emphasis added). In light of the facts of the case, and the erroneous holding of the district court that the leases were between Unity Group and the developer, the Court relied on the signatory status of Owners Corp. to support its holding. The Court did not hold that, regardless of circumstances, only signatories to a lease are granted the power of termination by the Act.[4]

Application of the "signatory rule" put forward by plaintiffs would, in the circumstances of the case at bar, foil the policy of the Act. The Commercial Lease was negotiated and entered into by the Developer and the Tenant, at a time when the Tenant was still controlled by the Developer. The Lease is a classic example of self-dealing, and the favorable terms granted to the Tenant reflect the absence of arms-length negotiations. Upon conversion, the Developer transferred its leasehold interest in the property to the Association which was at that time still controlled by the Developer. The Act was clearly intended to provide a remedy for the Association under these circumstances. *See 233 East 86th Street v. Park East Apartments*, 131 Misc.2d 242, 245, 499 N.Y.S.2d 853, 856 (N.Y.Sup.Ct.1986) (holding that the Act should be read broadly to effectuate its remedial purposes).

### 2. Pre–Conversion and Post–Conversion Leases

██ Plaintiffs argue that since the Lease was entered into prior to conversion, and the terms of the Lease were fully disclosed in the Offering Plan, the purposes of the Act are inapplicable. Plaintiffs' interpretation of the Act as solely permitting termination of leases negotiated by the Developer and the Association after conversion is supported by *dicta* in at least one judicial opinion. In *Brabert Realty Co. v. 20125 Owners Corp.*, 703 F.Supp. 314 (S.D.N.Y.1989), Judge Leval stated the following:

> The Act recognized, and undertook to remedy the serious potential for abuse that arises during the course of conversion when the sponsor, exercising "special developer control" of the cooperative association, can enter into self-dealing leases below market that will deprive the association of valuable assets. Had the sponsor entered into the self-dealing leases prior to conversion, they would be immune to termination under the Act and appropriately so because the association would have clear prior notice that such premises were not part of the assets it was acquiring in the conversion. If, on the other hand, such self-dealing leases are made on behalf of the association after conversion by the sponsor acting through special developer control, this can deprive the association of assets on which its members may have reasonably relied on in the conversion process.

*Id.* at 317. Under this reading of the Act, the Association would be automatically barred from terminating the Commercial Lease, as the Lease was entered into prior to conversion. However, the text of the statute clearly set outs the prerequisites for termination, and the rule enunciated by Judge Leval is not provided for. The Court

**4.** Although the common law does not clearly delineate who is a "party" to a contract or lease (*see* discussion *infra*), plaintiffs' overly formalistic approach is in stark contrast to the evolved logic of the common law. In New York State, parties may be fully and completely bound to a contract even if they do not sign it, if they act pursuant to it, or otherwise assent to it. *See generally* N.Y.Jur.2d, *Contracts*, § 16.

declines to add to the requirements of the statute, without guidance from a higher court.

In *West 14th Street Commercial Corp.*, the Second Circuit permitted termination of leases entered into prior to conversion which were fully disclosed to the tenants in the offering plan. Judge Leval attempted to distinguish *West 14th Street Commercial Corp.* by pointing out the potential for abuse in the negotiations between the developer and Unity Group, and questioning whether the negotiations were based on complete information. *See Brabert Realty Co., supra*, 703 F.Supp. at 317 n. 6. Still, however, the Second Circuit clearly permitted termination of leases which were entered into prior to conversion and which were disclosed in the offering plan. The Court does not believe it prudent to evaluate in each case the fairness of the lease negotiations, as implicitly suggested by Judge Leval, prior to determining the terminability of the lease. Rather, both pre-conversion and post-conversion leases should be terminable pursuant to the Act. Nothing in the statute is to the contrary.

The rule of law set out in dicta in *Brabert Realty Co.*, if applied strictly, would transform the Act into merely a disclosure statute, and would ignore the inherently complex, rapid, and coercive nature of the conversion process itself. The Court declines to apply this rule of law to the case at bar. The Court believes that the Act was passed to allow unitholders, through the association, to terminate abusive, self-dealing leases, even when such leases are entered into prior to conversion and fully disclosed in the offering materials. Any individual unitholder, whether elderly or not, is placed in a vulnerable position during cooperative conversion. On the one hand, the unitholder may not have the capability to absorb and analyze the vast amount of offering materials. *See* Ex. F to Aisenberg Aff. On the other hand, if he

disapproves of the offering plan, he faces the prospect of either rejecting the offer and, in many cases, moving out of his residence, or attempting to form an organized opposition to the developer as occurred in *West 14th Street Commercial Corp.* In passing the Act, Congress recognized this vulnerability, and created a remedy whereby an association could attempt to rectify certain of the more abusive aspects of the conversion process even after conversion was complete.[5]

3. Analogous State Law

The common law of New York State, although not binding on the Court with regard to the Act, bolsters the holding of the Court by way of analogy. First, it is important to realize that the common law does not provide a clear definition of a "party" to a contract or lease, or, more specifically in the context of the Act, which individuals or entities a contract or lease is "between." The common law merely defines the rights and obligations created by a contract or lease, and determines which individuals benefit from or bear such rights and obligations. Plaintiffs' arguments assume that the greater the rights and obligations of an individual with regard to a contract or lease, the more likely it is that he is a "party." Thus an individual who negotiated, signed, and initially performed the obligations of a contract or lease would be a "party," due to the full panoply of rights and obligations that he possesses. On the other hand, if the individual comes to possess only certain minimal rights and obligations pursuant to the contract or lease, such individual, depending on the circumstances, might not be considered a "party."

Plaintiffs argue that the common law of real property provides many examples of individuals or entities undertaking obligations or receiving benefits pursuant to a lease without becoming "parties" to the

---

5. As quoted in footnote 1, *supra*, the Second Circuit has stated that: "Realizing that many tenants are too unsophisticated on account of age or infirmity to evaluate properly the complex choices offered them upon conversion, Congress sought to alleviate developer abuses during the conversion process." This characterization of Congressional intent recognizes that the Act is more than a disclosure statute, and permits termination even when the terms of leases are fully known to the tenants prior to conversion.

lease. Plaintiffs argue that there is a fundamental distinction between acquiring property "subject to" a lease, and actually becoming a party to the lease. In the former case, an individual may buy property which is being leased, and thereby will only take on those covenants which run with the land, and those liabilities which arise after acquisition. *Longley–Jones Associates, Inc. v. Ircon Realty Co.,* 67 N.Y.2d 346, 347–48, 502 N.Y.S.2d 706, 707, 493 N.E.2d 930, 931 (1986). According to plaintiffs, such an individual would not be a "party" to the lease under § 3607(a)(2) of the Act. Plaintiffs argue that the law of New York State is clear that an individual will not completely step into the shoes of the transferor, and thereby become a party to the lease, unless he affirmatively assumes the obligations of the lease. *Longley–Jones Associates, Inc., supra,* 67 N.Y.2d at 348, 502 N.Y.S.2d at 707, 493 N.E.2d at 931; *Bank of New York, Albany v. Hirschfeld,* 37 N.Y.2d 501, 506, 374 N.Y. S.2d 100, 103, 336 N.E.2d 710, 712 (1975).

Although the Court questions the ultimate usefulness of plaintiffs' legal analysis in interpreting the Act, it is noteworthy that the New York Court of Appeals cases cited by plaintiffs appear to lend support to the position of the Association. In *Bank of New York,* the lease in question provided that "in the event of any sale ... of said land and building ... it shall be deemed and construed without further agreement between the parties or their successors in interest ... that the purchaser ... has assumed and agreed to carry out any and all covenants and obligations of the Landlord hereunder." *Bank of New York, supra,* 37 N.Y.2d at 506, 374 N.Y.S.2d at 103, 336 N.E.2d at 712. The court held that the purchaser's failure to object to the obligations of the covenants contained in the lease, when·viewed in light of the quoted provision of the lease, acted as an affirmative assumption of all the covenants and obligations of the lease. *Id.* The court in *Longley–Jones Associates, Inc.,* in holding that the purchaser had not assumed the covenant in question, distinguished *Bank of New York* based on the absence of the lease provision quoted above. *Longley–*

*Jones Associates, Inc., supra,* 67 N.Y.2d at 348, 502 N.Y.S.2d at 707, 493 N.E.2d at 931.

Section 33.01 of the Commercial Lease is virtually identical to the lease provision in the *Bank of New York* case which the Court of Appeals interpreted as constituting an affirmative assumption by the purchaser of all the covenants and obligations of the landlord. As the Court has previously stated, this fact does not necessarily establish that the Association is a party to the Commercial Lease under § 3607(a)(2) of the Act. It does show, however, that under the common law of the state in which the transactions took place, the Association, even though not a signatory to the Lease, would be viewed as having taken over all the covenants and obligations of the "Landlord" under the Lease.

■ This characterization of the transactions lends compelling support to the conclusion that the Association should be considered a party to the Commercial Lease. The Association is at present carrying out all the obligations of Landlord under the Lease. Aside from liabilities arising prior to conversion, the Association has in all respects stepped into the shoes of the Developer with regard to the Lease. Thus, common sense dictates that the Association is now a party to the Lease, even though the Association has not signed the Lease. In light of the preceding analysis, the Court finds that the Lease is "between" the Association and the Tenant in fulfillment of the requirements of § 3607(a)(2) of the Act. Plaintiffs' motion for summary judgment on the first count of the complaint is denied.

### C. Motion for Summary Judgment on Count II

■ Plaintiffs allege in the second count of the complaint that the statutory timeframe for termination of a lease pursuant to the Act expired prior to the Association's vote to terminate the Commercial Lease. Section 3607(b) of the Act permits termination within two years of the end of "spe-

cial developer control," as defined at 15 U.S.C. § 3603(22), or the time that the developer owns 25% or less of the cooperative units, whichever occurs first. Plaintiffs argue that the Developer has never possessed "special developer control" in the case at bar, and that therefore the time for the Association to terminate the Lease expired two years after conversion, on December 15, 1988. *See* Complaint, ¶ ¶ 57–58.

Section 3603(22) of the Act defines "special developer control" as:

> any right arising under State law, cooperative or condominium instruments, the association's bylaws, charter or articles of association or incorporation, or power of attorney or similar agreement, through which the developer may control or direct the unit owners' association or its executive board. A developer's right to exercise the voting share allocated to any condominium or cooperative unit which he owns is not deemed a right of special developer control if the voting share allocated to that condominium or cooperative unit is the same voting share as would be allocated to the same condominium or cooperative unit were that unit owned by any other unit owner at that time.

As with other sections of the Act, there is scant case law on the precise definition of the key operative language of the provision—to wit, "through which the developer may control or direct the unit owners' association or its executive board."

The Association argues that in the case at bar, the individual proprietary leases, which constitute "cooperative or condominium instruments" under § 3603(22), contain a manifold grant of powers over the Association to the Developer. These provisions allow the Developer to veto certain decisions made by the Association, *inter alia*, to increase the number or change the type of employees from those described in the Offering Plan, to restructure or to increase the amount of the indebtedness of the Association, or to make major capital improve-ments or to levy assessments for such improvements or repairs unless required by law. It is clear to the Court that these retained powers allow the Developer to exercise substantial control over the business affairs of the Association. Without more specific guidance from Congress or the courts, this Court must rule that such powers constitute "special developer control" under the Act.[6] Plaintiffs' motion for summary judgment on the second count of the complaint is denied.

### D. Motion for Summary Judgment on Count VII

Plaintiffs allege in the seventh count of the complaint that the Association's use of proxies to conduct the vote concerning termination of the Lease was not authorized by the Act, and therefore the vote should be declared void. *See* Complaint, ¶ ¶ 81, 84. Plaintiffs argue that at common law, there is no "right on the part of a member of a stock corporation to vote by proxy. That right is given by statute in New York." Plaintiffs' Memorandum of Law, at 16 (*quoting Dal–Tran Serv. Co. v. Fifth Ave. Coach Lines, Inc.*, 14 A.D.2d 349, 353, 220 N.Y.S.2d 549, 554 (1st Dep't 1961) (citations omitted)).

The Court has already qualified the applicability of New York State law when employed to interpret the provisions of the Act. Given the wide acceptance of the use of proxies generally, and the absence of any provisions in the Act restricting the methods by which unitholder votes should be conducted, the Court sees no reason to invalidate the vote previously taken by the Association. There is no evidence or suggestion that the use of proxies in the case at bar was improper or coercive, but rather was solely for the sake of administrative convenience. Plaintiffs' motion for summary judgment on count seven of the complaint is denied.

### CONCLUSION

Plaintiffs' motions for summary judgment on counts one, two, and seven of the

---

**6.** Plaintiffs' argument that "special developer control" cannot exist when an association possesses the power to terminate a lease pursuant to the Act is an overly restrictive interpretation of the statute, and is not supported by the text of the statute or case law.

complaint are denied. The parties are instructed to appear at a pre-trial conference before the Court on Friday, September 14, 1990, at 10:30 a.m., in Courtroom 36 of the United States Courthouse, New York, New York.

SO ORDERED.